W. L. NUGENT ET AL. v. THE BOARD OF MISSISSIPPI LEVEE COMMISSIONERS.

LEVEE COMMISSIONERS. *Public corporation. Negligence of agents. Action for damages. Statutes construed.*

An act of the Legislature of 1865 appointed and constituted six named persons a body politic and corporate, by the name of "The Board of Levee Commis-

sioners," for the counties of B., W., and I., who were to hold office for a certain term, or until their successors should be qualified; and the latter were to be elected by the Boards of Police of the respective counties, on the day when the terms of those appointed should expire, and biennially thereafter, for the term of two years. The Board of Levee Commissioners was authorized to have succession for twelve years; to sue and be sued in its corporate name; to have a common seal; to make by-laws, not inconsistent with its charter and the laws of the State, for carrying into effect the purpose of its incorporation; to appoint all officers and agents deemed necessary, and to do all other acts, not in violation of the laws of the State, which might be necessary to effectuate the purposes of that act. It was made the duty of the board to rebuild, strengthen, and elevate old levees, or to make new ones; and it was empowered to employ all engineers and agents necessary for such work, to determine the base, height, and shape of levees, and to make all needful regulations and do all acts necessary to secure said counties from overflow. The act provided "that, for the purpose of building, repairing, and constructing the levees aforesaid, and for carrying into effect the object of securing the counties of B., W., and I. from overflow by the Mississippi River," there should be levied a certain specified tax. And the board was empowered to issue bonds in a given amount to raise money for building and repairing levees. A president, treasurer, and secretary of the board were provided for; and the board was required to meet twice a year, at a place named, and each commissioner attending was allowed a certain per diem and mileage. The board was required to appoint inspectors in each county, whose duty it should be, in times of overflow, to examine the levees, and "upon emergency or danger to the levees," of which the inspector should be the judge, to call out a specified class of persons, who would be bound, under a penalty, to work on the levees. And compensation was provided for work thus done. A method was provided for condemning lands on which to construct levees; and it was made a felony to injure the levees. Stringent provision was made for the collection of the taxes by the sheriff and auditor of public accounts. And it was provided that if it should appear to said board that the fund arising from the taxes levied would exceed the amount necessary to pay off and discharge "the bonds, and interest, issued under this act, and also all the indebtedness and liabilities that may be incurred by said board under the provisions of the same," the board might suspend, in part, the collection of the taxes. Each member of the board was required to give a bond to the State, in the penalty of $20,000, "conditioned for the faithful performance of the duties of his office." By subsequent legislation the name of the board was changed to "The Board of Mississippi Levee Commissioners," its corporate existence was extended fifteen years, and an additional tax was levied. The commissioners above named are public officers, and the board composed of them is a public corporation, created to administer a public trust, the scope of which is defined by the act of the Legislature creating it, and provided with a fund by the levy of a special tax, which cannot be diverted from the purposes of the trust. And no action can be maintained by a land-owner in any of the counties above mentioned, against said corporation, to subject this fund to a claim for

damages to his land resulting from carelessness, negligence, recklessness, or unscientific work in the construction of a levee by the agents and employees of said board.

ERROR to the Circuit Court of Washington County.

Hon. B. F. TRIMBLE, Judge.

The case is stated in the opinion of the court.

*Nugent & McWillie*, for the plaintiffs in error.

Are defendants in error liable for negligence and recklessness in the discharge of their duties under the act of November 27, 1865, entitled "An act to incorporate the Board of Levee Commissioners for Bolivar, Washington, and Issaquena counties"?

We admit that a corporation is not answerable for a merely erroneous exercise of the discretion it is vested with, however injurious the consequences; but it is undoubtedly true that an action of trespass on the case will lie against a corporation aggregate for neglect of a corporate duty by which the plaintiff suffers. *Riddle* v. *Proprietors, etc.*, 7 Mass. 169. It is equally true that for acts done by the agents of a corporation, either *ex contractu* or *ex delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances. *Philadelphia, Wilmington & Baltimore R. Co.* v. *Quigley*, 2 How. 210; *Howe Machine Co.* v. *Sander*, 58 Ga. 64; 2 Mo. App. 565; 27 La. An. 367; 44 Iowa, 314; 77 N. C. 233; 57 Tenn. 459; 46 Texas, 272; 47 N. Y. 282; Ang. & Ames on Corp., sects. 382–386 *et seq.* In *Railroad Company* v. *Hanning*, 15 Wall. 649, it was distinctly adjudged that whenever an injury has been sustained by a third person from the negligent manner in which the work of a corporation has been constructed or protected, the company is liable for the negligence of its servants in the course of their employment, although it does not authorize or know of the acts complained of. The defendants in error are liable in this case unless there be something to distinguish them from other corporations, or in the act, to prevent.

A distinction was drawn in the case cited from 7 Mass. 169, the court using this language: "We distinguish between

proper aggregate corporations and the inhabitants of any district who are by statute invested with particular powers *without their consent.* These are, in the books, called *quasi-*corporations. Of this description are counties and hundreds in England, and counties, towns, etc., in this State. Although *quasi*-corporations are liable to information and indictment for a neglect of a public duty imposed on them by law, yet it is settled in the case of *Russell* v. *Men of Devon* that no private action can be maintained against them for a breach of their corporate duty unless such action be given by statute. And the sound reason is, that, having no corporate fund and no legal means of obtaining one, each corporator is liable to satisfy any judgment rendered against the corporation. This burden the common law will not impose but in cases where the statute is an authority to which every man must be considered as assenting. But *in regular corporations* which have, or are supposed to have, a corporate fund, *this reason does not apply.*" If this reasoning is available to explain the distinction, it would follow that any regular corporation having a corporate fund would be liable for the negligence of its agents and servants. See 3 Cranch C. Ct. 70.

In *Mayor, etc., of Lyme Regis* v. *Turner*, Cowp. 86, the corporation of Lyme Regis was sued for not repairing and clearing a certain creek in which the tide ebbed and flowed, as from time immemorial they had been used, by which plaintiff lost his navigation. The defence was that the creek was a highway, etc., but Lord Mansfield said the creek was not necessarily a highway, and held the corporation liable in case for neglect of a corporate duty.

The whole subject was admirably discussed in *Mayor, etc., of Lyme Regis* v. *Henley*, 2 Cl. & Fin. 331, and the question, we think, set at rest. Say the court: " The mayor and burgesses, having accepted the charter, became legally bound to repair the buildings, banks, and sea-shore; and this obligation being one which concerned the public, an indictment would lie against them for non-repair, and an action on the case for a

direct and particular damage sustained by an individual." It has frequently been held that a private action cannot be maintained against a town without a charter, or other *quasi*-corporation, for a neglect of corporate duty, unless such action be given by statute ; but in *Bigelow* v. *Randolph*, 14 Gray, 543, Justice Metcalf said : "This rule of law is, however, of limited application. It is applied, in the case of towns, only to the neglect or omission of a town to perform *those duties which are imposed on all towns without their corporate assent*, and *exclusively for public purposes*, and not to the neglect of those obligations *which a town receives when a special duty is imposed upon it with its consent, express or implied, or a special authority is conferred on it at its request.* In the latter case a town is subject to the same liabilities for the neglect of those special duties to which private corporations would be if the same duties were imposed, or the same authority conferred on them, including their liability for the wrongful neglect as well as the wrongful acts of their officers and agents."

We refer to a few of the cases affirming the liability of corporations, at the common law, in the actions of trespass, trover, trespass on the case *ex delicto*, or for torts commanded or authorized by them or by their agents, and for damage caused by lawful acts. *Rhodes* v. *Cleveland*, 10 Ohio, 59 ; *Hawkins* v. *Steamboat Co.*, 2 Wend. 452 ; *McCready* v. *Guardians of the Poor*, 9 Serg. & R. 94 ; *Lyman* v. *White River Bridge Co.*, 2 Aik. 255 ; *Goodloe & Smith* v. *Cincinnati*, 4 Ohio, 500 ; *Hamilton County* v. *Turnpike Co.*, Wright, 603 ; *Kneass* v. *Schuylkill Bank*, 4 Wash. C. Ct. 106 ; *Beach* v. *Fulton Bank*, 7 Cow. 485 ; *Maynard* v. *Insurance Co.*, 34 Cal. 48 ; *Watson* v. *Lisbon Bridge*, 14 Me. 201 ; *Hooksett* v. *Amoskeag*, 44 N. Y. 30, 105 ; *First Baptist Church* v. *Railroad Co.*, 5 Barb. 79.

In Shearman & Redfield on Negligence, the points conclusively establishing the liability of municipal corporations for negligence are stated as follows :—

1. The law must have imposed an imperative duty upon the corporation so as to make the neglect culpable. Sect. 123.

2. *If there is nothing in the statute creating the corporation which shows a contrary intention in the Legislature, the true rule of construction is, that the Legislature intended that the corporation's liability should, to the extent of its corporate funds, be coextensive with that imposed by the general law on individuals doing the same things.* Sect. 124. 3. The fact that the acts and omissions were those of the corporation's servants does not affect their liability. Sect. 137. 4. Negligence may consist either in the original faulty and unskilful construction, or in the subsequent improper maintenance or unsafe condition by reason of want of repair, etc. Sect. 143. 5. In regard to the *construction* of public works, the general rule is, that while the question whether or not the work itself shall be done is discretionary, yet if the corporation undertakes its execution, it is bound to exercise that care and prudence which a discreet and cautious individual would or ought to use if the whole risk or work were his own (sect. 144); or, in other words, it was bound to see that the work was skilfully done. Ibid. As said in foot-note 2 to said section, " The degree of care and foresight which it is necessary to use in cases of this description must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guarded against." The necessity for a corporate fund is repudiated by these authorities. Sect. 155. See 54 Miss. 391.

We admit that the Legislature could have exempted the Levee Board from liability for the negligence of agents, servants, or employees, but insist that, as it has not expressly done so, it must be presumed that the Legislature's intention was that the corporation's liability should, to the extent of its corporate funds, be coextensive with that imposed by the general law on individuals doing the same thing. Shear. & Redf. on Neg., sect. 124.

Upon examination of the act of the Legislature referred to in the declaration (Laws 1865, p. 57 *et seq.*), we find all the elements necessary to fix liability upon the defendants.

They were a chartered corporation with full power to sue and be sued, were provided with a corporate fund, were charged with an imperative duty to the public and the owners of property lying in the three counties, and there is nothing in their charter indicating any intention on the part of the Legislature to exonerate them from liability for their acts or negligence. There is no reason of public policy against the holding of the board to liability. It may be said that other suits will follow this : the answer is, the assertion is not well founded in fact, in view of the lapse of time ; and the property rights of the citizen must be recognized and protected. The maintenance of the present action will render the commissioners more careful in the future, and force attention to the great corporate duty devolved upon them. If, on the contrary, they are exempt from all liability and their discretion is absolute, the levee law is a snare and a delusion. If unadulterated negligence and recklessness in the board is not in some manner to afford ground of attack, the people are without power to compel respect to law. The act of 1872 requires the board to take from each commissioner a bond in the penalty of *twenty thousand dollars*, conditioned for the faithful performance of the duties of his office, but affords no remedy to the people upon that bond. Acts 1872, p. 227. While this act was passed *after* the acts of negligence complained of, it seems to sustain the view we are presenting. If the wrong can be traced to any member of the board, the corporation has the right of action on his bond for any loss sustained thereby ; but the individual sufferer has no redress whatever upon the bond.

Aside from this, the board made the contract for the building of the levee, determined its base, height, slope, and dimensions, employed engineers to inspect the work as it progressed, and exacted bonds from the contractor. If there be a breach of the condition of these bonds, the board has its remedy *over:* *it can sue the contractor and be made whole.* But of what use are these bonds of contractors to the people who are overflowed because of a faulty construction of the levees? *They*

*are payable to the board, and conditioned for the building of levees according to plans and specifications furnished. If they fail, and an overflow occurs because of their failure, the people cannot sue upon the bonds; they must look to the corporation alone, and that to the bond.* No loss of revenue can arise from a broken law; the tax runs on and the people have to pay it, in any and every event, or lose their property. Surely the law did not intend that this burden should be borne — that there should be no immunity for the people, and every possible protection for the board. Was the duty public? In one sense, yes; but in another it was a great duty to every land-owner who was called upon to make his contribution to the fund created for the building of the levees. The board had all the functions and powers required for the faithful performance of their work: they had discretion to locate the levee and compel submission on the part of the people; they could employ skilled engineers; they could make any contract necessary to secure the proper building of a perfect levee; they could take bonds to protect themselves and the people; they were provided with large revenues; and the imperative duty was laid upon them to protect the country from overflow. They were not exempted from liability for negligence: even this liability was provided for. Having, therefore, every means and facility to discharge their duties thoroughly and well, and every power at all requisite, with what show of reason can it be said that they may be shamefully and recklessly negligent in the discharge of that duty, without any responsibility to the citizen thereby damaged?

*Percy & Yerger*, for the defendant in error.

The defendant in error was incorporated by act of November 27, 1865. The scheme and purpose of the act is, by virtue of a system of taxation upon the three counties of Bolivar, Washington, and Issaquena, to collect a sufficient fund, and so dispose of it through specified agencies as to rebuild, strengthen, and repair the levees on the river-front of said counties. The Board of Commissioners is elected by the

several Boards of Supervisors of the three counties every two years. They receive a per diem, as do members of the Boards of Supervisors. They elect an engineer, a secretary, and a treasurer, and fix the salaries to be paid these officers. They determine the true height, slope, and elevation of levees, abandon old levees deemed by them unsafe, build new ones, and, in general, " do all acts necessary, in their opinion, to secure the counties under their charge from overflow by the waters of the Mississippi River." See act November 27, 1865, sect. 3. The fund given them with which to build and repair levees arises from a tax upon the property of the district, levied by this act. It is, therefore, a purely public corporation, created for purely public purposes, and sustained purely by public funds. Dill. on Mun. Corp., sect. 10 ; Ang. & Ames on Corp., sect. 14.

The inquiry then is, whether a liability upon the part of such a corporation arises from negligence in the performance of any part of its work. It is to be noted that it is not the district composed of the three counties which is incorporated, nor is it the inhabitants of that district, but the incorporation consists of certain named persons, who were first selected and designated by the State, and their successors in office, the latter to be biennially designated by the respective counties. The State, deeming the work to be done of public importance, selected certain agents to do it, and for more convenient management incorporated them. To raise the necessary revenue, it imposed the tax requisite upon the counties to be immediately benefited. The defendant, then, is an agent of the State for the purpose of making a certain public improvement. Judge Dillon quotes approvingly the doctrine that " in every case the liability of a body created by statute must be determined under a true interpretation of the statutes under which it is created." Dill. on Mun. Corp., sect. 752.

Tried by this rule, the plaintiffs' case must fail. It cannot for a moment be supposed that it was the intent and purpose of the act of November 27, 1865, to expose the inhabitants of

the three levee-tax-paying counties to claims for damages because of the blunders, the ignorance, or the worthlessness of the officers chosen to carry out the purposes of the act. The purpose was, by the common burden of taxation, and through the means of organization, to contest with the waters of the Mississippi the possession of the country, and when defeated or despoiled of their work in any one year, by the succeeding year's revenues devoted to " rebuilding and repairing," to renew the contest. It was further the purpose that, by frequently recurring elections, unscrupulous and dishonest or incompetent commissioners might be replaced with others deemed more worthy. The propriety of building levees, the possibility of thus restraining the floods within safe bounds, was then, as now, a disputed question among scientific men. The requisite base, height, slope of levees, etc., was a matter upon which engineers differed then, as they do now.

The means provided by the act, from which the Levee Board was to pay all valid claims against it, accrued solely from taxation. Necessarily, by the terms of the act and character of the population, the commissioners to be chosen on the board would usually be plain farmers, and not skilled engineers.

This is not a case of damage arising to an individual by reason of the construction of a public work, for which very properly the public is called upon to pay; but this is a case where the public, through its public servants and by a system of public works, undertakes to protect the whole community from impending and certain disaster, and by reason of the negligence or want of scientific knowledge upon the part of its servants at one point, the effort fails and the disaster as to plaintiffs in error is not averted. Yet, say plaintiffs in error, you must not only devote your taxes to " rebuilding and repairing " so as to protect me in future, but you must pay all damage because you failed to protect me in the past. It will not do to say that the demand is against the corporation, and not against the tax-payers of the district. The corpora-

tion is without means to respond, save as furnished by the tax-payers. The case at bar aptly illustrates the idea we are seeking to enforce. The substantial act, or rather omission, complained of, is that, in building a certain levee, defendant failed to include in it a "muck" ditch; this is the negligence, the recklessness, the want of science complained of. Now, the kind of levees to be constructed, their height, base, etc., are left absolutely in the discretion and sound judgment of the commissioners. In this instance it is fair to presume — and it is not charged otherwise — that the commissioners deemed a "muck" ditch unnecessary. It may be that they did not believe in "muck" ditches at all, and constructed their whole line of levee without them; and it may be that the disasters of 1872, 1874, and 1876 have taught them that "muck" ditches, scientifically speaking, are very essential ingredients in the proper construction of levees. It may be that, upon a trial of this case, experts summoned as witnesses would testify that it was sheer ignorance and utter neglect of all scientific rules to have constructed this levee without a "muck" ditch; yet we respectfully submit that neither the general rules of law applicable to public corporations nor the true interpretation of the act of incorporation would give the plaintiffs a right of action. It may have been a failure in public servants to discharge faithfully their official duties, or it may have been an error in judgment; but no liability ensues in either event. The same *crevasse* from which plaintiffs suffered unquestionably damaged probably forty other planters to an amount equal with plaintiffs. From this single *crevasse* we have, then, a damage constituting a legal claim against defendant, and consequently against the tax-payers of the district, of about $1,000,000. In three years of extreme high-water there were probably a half-dozen other *crevasses* of equal importance and inflicting equal damage.

The aggregate of damages consequent upon these numerous *crevasses* would reach several millions. In almost every instance it could probably be shown that the *crevasses* were

due to official mismanagement, ignorance, and rascality, and yet we are told that we must not only suffer the natural and legitimate consequences of overflow, but that we must go to work and tax the whole district, the plaintiffs themselves included, to reimburse the sufferers all damages which they have suffered by reason of our general mismanagement in levee matters. Law will not support any such doctrine, and reason revolts from it. If such intent can be deduced from the act of 1865, then the levee law, which thinking people in the levee district have generally considered a blessing, is nothing more or less than a curse.

The defendant may be properly classed among what Dillon calls *quasi*-corporations, and as such it is not liable for neglect of public duty unless such liability be expressly declared by statute. Dill. on Mun. Corp., sect. 762. As a public agency, there is no implied liability on its part for not doing the work consigned to it, or for doing the work negligently or unscientifically. Id., sect. 785. Under the theory of plaintiffs' suit, the defendant is an insurer that the property of the district will be protected from inundation, or at least that the work done by itself to that end shall be so well and skilfully done that disasters, when they come, must be attributed to the act of God or a public enemy.

If, however, the liability to be sued for unscientific or negligent work, to have a judgment rendered against it for resulting damages, and that judgment paid from the revenues of defendant, be established by this court, the levee system will be practically at an end. It would be the signal for each planter who may have been heretofore or may be hereafter damaged by a *crevasse* — and usually hundreds are damaged by one breach in the levees — to commence suit, alleging negligence or want of science as the cause of his loss. The board has under its charge two hundred miles of levee. It is dependent upon the honesty of contractors and the skill of engineers for its proper construction and repair in low water, and upon the vigilance and fidelity of its guards for its protec-

tion in high water. Whenever a *crevasse* occurs, the parties immediately under or affected by it are ready to swear that if this or that precaution had been adopted by defendant it could not have occurred. The mere mass of litigation, if the liability to be sued, as is contended for in this case, be established; would of its own weight, though generally unsuccessful, break down the system. Affrighted tax-payers would call for a repeal of the law.

GEORGE, J., delivered the opinion of the court. ·

The plaintiffs in error were joint owners of two plantations situated in Bolivar County, and near the Mississippi River, and they brought this action in the court below against the defendant in error to recover damages which they sustained by the overflow of said plantations in the years 1872, 1874, and 1876. A demurrer was sustained to the declaration, on the ground that the defendant was not liable for the damages, and the plaintiffs sued out this writ of error.

The declaration sets out the ownership of the two plantations by the plaintiffs and describes their location, and avers that they are " dependent for their protection from the overflow of the Mississippi River, and their successful cultivation as well as their value, upon the levee " extending along the bank of the Mississippi from Vick's front to Stormville, and " without such levee would be of very little value." The declaration then sets out the incorporation of the commissioners by the act of November 27, 1865, and various provisions of that act, averring that by its terms it was the duty of the defendants to rebuild, strengthen, or elevate the old levees on the river, or make new ones where they should deem it necessary ; and that they were empowered to employ all engineers and agents necessary for the work, and to determine the height, slope, and base of the levee, and to make all needful regulations and do all acts necessary, in their opinion, to secure the counties of Washington, Bolivar, and Issaquena, under their charge, from overflow by water from the Mississippi River. It also sets out the

provisions of the act levying ten cents an acre tax on all the lands in said counties, and one cent per pound on all lint cotton raised and gathered in the same, whereby an "annual revenue to a very large amount, to wit, the sum of $300,000, was provided by said act for said defendants to enable them to carry out efficiently and thoroughly the objects of their incorporation, and said revenue annually came into their hands." And it is further averred, "that, during the years 1869 and 1870 it became the duty of said defendants to make a new levee from Vick's front to Stormville, in such manner and of such base, height, slope, and size as to protect plaintiffs' plantations aforesaid from overflow during seasons of high water, and to exercise due care, caution, diligence, and discretion in and about the same." And it is averred, as a breach of this duty, "that the defendants so carelessly, negligently, unscientifically, and recklessly constructed said levee that during the years 1872, 1874, and 1876, the levee, because of the lack of a proper muck-ditch, and other defects, gave way before the pressure of high-water against it, whereby plaintiffs' plantations were inundated, their stock and fences destroyed, crops ruined, and land severely injured." The damages claimed are $30,000.

It is necessary to inquire into the nature of the corporation sued in this action, and its purposes and powers. The act (Sess. Laws 1865, chap. 1) appoints six named persons (two residing in each of the counties of Bolivar, Washington, and Issaquena) as levee commissioners, each for the county in which he resides. It declares "they shall hold office until the first Monday in January, 1868, and until their successors in office are elected and qualified;" that the commissioners thus appointed shall constitute and are hereby made a body politic and corporate, by the name of "The Board of Levee Commissioners for the Counties of Bolivar, Washington, and Issaquena," and by that name may sue and be sued, and have perpetual succession for the term of twelve years." They are empowered to have a common seal, and to make by-

laws, not inconsistent with the charter and laws of this State, for the purpose of carrying into effect the purposes of the corporation, and to appoint all officers and agents whom they may deem necessary, and to do all other acts, not inconsistent with the laws of the State, which may be proper to carry out and effect the purposes and objects of the act. The Boards of Police of the three named counties were required to meet on the first Monday in January, A. D. 1868, and every two years thereafter, and elect two commissioners for each county, "to hold their term of office for two years, and until their successors were duly elected and qualified." Said Boards of Police were required to fill vacancies as often as they might happen. By the third section of the act it was declared that the said Board of Levee Commissioners should have the power, and it was made their duty, to rebuild, strengthen, and elevate old levees·or make new ones; that they should have power to employ all engineers and agents necessary for the work; determine the base, height, and slope of levees; abandon old levees deemed by them unsafe, and make new ones, and to make all useful regulations and do all acts necessary, in their opinion, to secure the counties under their charge from overflow. Sect. 4 provided that, "for the purpose of building, repairing, and constructing the levees aforesaid, and for carrying into effect the objects and purposes of securing the counties of Bolivar, Washington, and Issaquena from overflow by the Mississippi River," there should be levied a uniform tax of ten cents an acre each year on all lands in said counties. By sect. 5 a tax of one cent per pound on all lint cotton grown and gathered in said counties was also levied for the same purpose. A president, secretary, and treasurer of the board were also provided for; and the board was empowered to issue bonds to the amount of $1,000,000 in order to raise money for building and repairing the levees. The board was required to meet at least twice·a year, at the county-seat of Washington County, on the second Mondays in April and October, and each commissioner attending was allowed $4 per diem and six

cents a mile for each mile travelled in attending said meeting. The board was required to appoint levee inspectors in each county, and their duties were prescribed ; among which was the duty to examine the levees three times a week during high water, " and upon emergency and danger to the said levees, of which each inspector shall be the exclusive judge, he is authorized to call out all male persons over sixteen and under sixty years of age residing within ten miles of the work." Provision was made for punishing persons so named who refused to attend, and for compensation for work thus done. Provision was also made for condemning lands on which to construct the levees ; and it was made a felony to cut or injure the levees. Stringent provisions were enacted for the collection of the taxes by the sheriff and auditor of public accounts. And by sect. 24 it was provided that if it shall appear to the Board of Levee Commissioners that the proceeds of the taxes therein levied and assessed will exceed the amount necessary to pay off and discharge the bonds, and interest, issued under the act, and also all other indebtedness and liabilities that may be incurred by said board under the provisions of the same, the board might suspend and reduce in part the collection of the tax.

By an act passed April 4, 1877 (Sess. Laws, p. 223), the corporate existence of the board was extended to fifteen years from the 1st of January of that year, and each member of the board was required to enter into bond, payable to the State, in the penalty of $20,000, " conditioned for the faithful performance of the duties of his office." By another act, passed January 27, 1877, the name of the corporation was changed to " The Board of Mississippi Levee Commissioners," and an additional specific tax was levied.

Such are substantially the provisions of the several acts creating and continuing the board, so far as they affect the questions involved in this case. From them it is manifest that the corporation is a public one, the commissioners being public officers, bound to discharge their duties by bonds

given to the State; that it had charge alone of public interests; and that it was created and set in operation solely by the will of the Legislature, without reference to the will of the people of the district over which its jurisdiction extended.    The work for which it was constituted was one of public concern; so much so that it is deemed to be of that degree of national importance which demands the interposition of the general government, both as to the means and the manner of its accomplishment.    The funds to be employed by it result from a tax levied directly by the Legislature, without the consent of the tax-payers or of the corporation.    It has no stockholders, no members even, except the commissioners charged with the duties prescribed by the act, who were selected in the first instance by the Legislature, and then by an agency prescribed by that body, to wit, the Boards of Supervisors of the several counties comprising the levee district.    It has no property, and no rights which enure to it solely in its corporate capacity.    It can make no gains either for its members, its own benefit, or the public.    It can levy no tolls, and its work, when accomplished, is incapable of individual use. Its sole revenue consists of taxes levied by the Legislature, to be expended solely in the performance of the public duty of protecting the district from overflow.    If there were a recovery in this action, there could be no satisfaction of the judgment except by a seizure of a fund devoted by law to another purpose.    This fund is also raised by a specific tax — a mode of taxation authorized by the Constitution only for the erection of works of this character; and this stamps it essentially as a trust fund devoted exclusively to the work provided for.

We do not think the action can be maintained.    "A distinction is made between those corporations which are endowed with special grants of power for the peculiar convenience and benefit of the corporation, on the one hand, and the incorporated inhabitants of a district, who are by statute invested with particular powers, without their consent, on the other. On the latter the State may impose corporate duties and com-

pel their performance, under penalties; but corporators who are made such whether they will or no cannot be considered in the light of persons who have voluntarily, and for a consideration, assumed obligations so as to owe a duty to every person interested in their performance." Cooley's Const. Lim. 247. There is more reason for holding the taxpayers of this district not liable, in this case, than for holding the latter class above described by Cooley exempt from corporate liability; for in this case it is clear that the Legislature intended merely to create a State agency — that the commissioners are in fact public, not corporate officers, endowed with a corporate being only for the convenience of administering a public trust confided to them. The State has defined this trust and its attendant duties, — the building and repairing of the levees, — and has furnished the means of performance — the tax fixed by the Legislature. The corporation has merely administrative duties to perform — a work prescribed by the Legislature, and with means furnished by the Legislature. This fund the commissioners may bind by acts done in pursuance of law, and to the extent allowed by law. Any other disposition of it would be a violation of law, and therefore void. Their inability to divert the fund is total. It cannot be removed or lessened by the commission of a wrong to another. Whoever has been injured by their wrongful act must look alone to the wrong-doer for redress, not to innocent tax-payers whose funds have been committed to the charge of the commissioners.

It is insisted, however, that, under the decisions of some English and American courts, the corporate funds are liable for the neglect of the commissioners in building the levee with a defect which has occasioned damage. We have examined many cases in England and in the United States on this subject, and we find that they are irreconcilable, and some of them seem to be decided on improper principles.

As early as 1701, in *Lane* v. *Cotton*, 1 Ld. Raym. 646, it was decided that a public officer was not responsible for the acts of another whom he was compelled to employ. This case

was afterward affirmed in *Whitfield* v. *Le Despencer*, Cowp. 760, Lord Mansfield delivering the opinion of the court.   This principle was afterwards applied in exoneration of persons undertaking gratuitously to do a work for the public, if they acted *bona fide.*   See *Sutton* v. *Clark*, 6 Taun. 29 ; *Holliday* v. *St. Leonard's Shoreditch*, 11 C. B. (N. s.) 192 ; *Coe* v. *Wise*, 5 Best & S. 440 ; *Hall* v. *Smith*, 2 Bing: 156.   But in exonerating such persons from liability for the omissions, negligence, and misconduct of those whom they were compelled to employ, it was admitted that they were liable for their own misconduct.   When, afterwards, such persons acting gratuitously were clothed with a corporate character, this principle was applied exactly as if they were individuals. And when they were sued in their corporate capacity, the inquiry began to be made whether the injury for which they were pursued was the fault of their employees or of themselves personally ; and the principle of their individual liability was applied so as to make them liable as a corporation.   *Whitehouse* v. *Fellowes*, 10 C. B. (N. s.) 765 ; *Ruck* v. *Williams*, 3 Hurl. & N. 305.

The vice of this reasoning consists in regarding the commissioners, or executive body of the corporation, as being the same as the rate-payers whose funds were to be applied to make good the damages occasioned by the personal fault of the managers.   It would have been more logical to have held that, as the commissioners could only be held personally answerable for their individual misconduct, so the rate-payers would be answerable only for misconduct directly traceable to them. This obviously just view was attempted to be met by assuming that the commissioners were the representatives of the rate-payers.   Thus, Lord Campbell, in *Southampton and Itchin Bridge Company* v. *Southampton Local Board*, 8 El. & Bl. 801, in answer to the objection that a recovery against the corporation would be a great hardship to the rate-payers, who would thus be compelled to pay for the neglect and blunders of the board of commissioners, said that the objection was met by

the consideration that the members of the board are elected by the rate-payers, and are, therefore, their representatives.

In this case they are not representatives, even on Lord Campbell's theory, which derived their representative character from an election by the rate-payers; for here they are selected without the agency of those who contribute to the fund. But we desire to put the case on a stronger and broader ground. The Levee Commissioners are simply public officers clothed with a corporate capacity solely for the convenience of administration, and are endowed with no representative character as respects the tax-payers; and if they had such character, it would be strictly limited to those duties which by law they were authorized to perform.

Justice Mellor, in *Coe* v. *Wise*, 5 Best & S. 440, undertook to make a classification of the cases by which the individual and corporate liability of such bodies was to be determined. He said: "The cases on this subject are not easily reconcilable, but those which establish the liability of trustees or commissioners acting gratuitously in the execution of a public trust may be classed as follows: Firstly, cases of individual liability, where trustees or commissioners have exceeded or abused their powers. Secondly, cases in which the duty or obligation imposed on such trustees or commissioners has been violated by reason of directions or orders given by them for the doing of the very acts from which damage to others has resulted. Thirdly, cases of commissioners, trustees, or corporations authorized to construct or maintain works for trading, or the like profitable purposes, — such as dock trustees, corporations acting as proprietors of gas or water-works, and the like, — in which cases, although they may act without reward, yet the object of their incorporation or constitution is to make or maintain works yielding profitable returns, either by tolls and dues or payment for services rendered, and in their very nature are mere substitutions on a large scale for individual enterprise."

In this third class the learned judge thought the liability of

the corporate funds should be allowed to the extent that they were derived from the tolls received and gains made in the use of their works by the public; that, as they were carried on for gain, and were substitutions for individual enterprise, they should, like individuals, be held liable in damages to those who used the works and contributed to their funds. The learned judge distinguished the case before him from this class, stating that "the commissioners here are authorized, for public objects, to erect and maintain great works of drainage and navigation. They derive no other profit from the execution and maintenance of the works than a share in the beneficial results anticipated therefrom. The funds for their construction and maintenance are raised by rates imposed upon the district supposed to be benefited thereby; but no business is authorized to be carried on for profit, nor are any tolls authorized to be taken for any use of the works. The object is public, though the direct benefit is local.    *    *    *    The commissioners have no property except such as is strictly incident to the machinery for making and maintaining the works and raising the necessary rates, and have no power to levy a rate for any other purpose." It will be perceived at once how strictly analogous that case is to the one now before us, and how just the observations of the learned judge are, as applicable to this case. It is said, however, that the law has been finally settled in England the other way by the leading case of *Mersey Docks* v. *Gibbs*, 11 H. L. Cas. 686, decided in 1866. There are many expressions in the opinion of Justice Blackburn which are inconsistent with *Coe* v. *Wise*, in which case he sat, and dissented. But a careful reading of the opinion will show that the decision turns upon the fact that the trustees were a trading corporation, receiving tolls for the use of the docks, and that therefore they ought to be held to the same liability as individuals doing the same work and receiving pay for it; and, in fact, he bases the decision mainly upon *Parnaby* v. *Lancaster Canal Company*, 8 Ad. & E. 230, in which a private corporation was held liable for a failure to

repair its canal. Lord Chancellor Cranworth's opinion in *Mersey Docks* v. *Gibbs* put the liability of the trustees also on the principles settled in the case of *Parnaby* v. *Lancaster Canal Company*, affirmed on error, in 11 Ad. & E. 223, and said: "The only difference between that case and the one now before us is, that here the appellants, in whom the docks are vested, do not collect tolls for their own profit, but merely as trustees for the benefit of the public. I do not, however, think that this makes any difference in principle in respect to their liability. It would be a strange distinction to persons coming with their ships to different ports of this country that in some ports, if they sustain damage by the negligence of those who have the management of the docks, they will be' entitled to compensation, and in others they will not; such a distinction arising, not from any visible difference in the docks themselves, but from some municipal difference in the constitution of the bodies by which the docks are managed." The cases of *Winch* v. *Conservators of the Thames*, L. R. 9 C. P. 388, decided in 1874, and *Forbes* v. *Lee Conservancy Board*, L. R. 4 Exch. Div. 116, decided in 1879, construe *Mersey Docks* v. *Gibbs* as having been decided on the principles above stated.

But the extension of the rule thus far was resisted in England by many eminent judges. In *Mersey Docks* v. *Gibbs*, Lord Wensleydale agreed to the judgment expressly on the ground of authority, stating if the matter were *res integra* he would hold that the trustees were public officers, and not responsible for the negligence of their employees. *Duncan* v. *Findlater*, 6 Cl. & Fin. 914; *Baker* v. *Harris*, 4 Man. & Sel. 26; *Humphreys* v. *Mears*, 1 Man. & R. 187; *Hall* v. *Smith*, 2 Bing. 156; *British Cast-Plate Co.* v. *Meredith*, 4 Term Rep. 794; *Sutton* v. *Clarke*, 6 Taun. 29; *Coe* v. *Wise*, 5 Best & S. 440; *Feoffees of Heriot's Hospital* v. *Ross*, 12 Cl. & Fin. 506; *Metcalf* v. *Heatherington*, 11 Exch. 257; *Holliday* v. *St. Leonard's Shoreditch*, 11 C. B. (N. s.) 192, all announce principles more or less at variance with those recognized in *Mersey Docks* v. *Gibbs*.

The difficulty has been to reconcile the taking of a fund donated or raised by taxation for a specific purpose, and appropriating it to the payment of damages arising from the wrongful acts of its managers, with the just rights of the donors or tax-payers.    In *Duncan* v. *Findlater, supra,* Lord Cottingham said : "It is impossible to suppose that the framers of the statute [making the corporation] contemplated that any of the funds would be appropriated for the purpose of affording compensation for any act of the persons who might be employed under the authority of the trustees.    *    *    *    If the thing done is not within the statute, either from the party having exceeded the powers conferred by the statute, or from the manner in which he has thought fit to perform the work, why should the public fund be liable to make good his private error or misconduct?"    And in *Feoffees of Heriot's Hospital* v. *Ross,* 12 Cl. & Fin. 506, the same learned judge reiterated what he said in *Duncan* v. *Findlater;* and Lord Campbell used this strong language : "The case of *Duncan.* v. *Findlater* gave universal satisfaction, and the mistaken practice which it overthrew has been universally scouted ;" and he said of the opposite view, that "it was contrary to reason, sense, and justice, and wholly unsupported by authority."

In the United States we find but two cases on this precise principle.    In one, *Glavin* v. *Rhode Island Hospital,* 9 Cent. L. J. 329, the principle of *Mersey Docks* v. *Gibbs* was applied so as to make the funds of a charity hospital, raised by donations, liable for the negligence of its employees in treating a patient; in the other, *McDonald* v. *Massachusetts General Hospital,* 120 Mass. 437, the contrary conclusion was reached.    But the general principle that absolves from liability the tax-payers whose funds constitute the treasury of the public corporation established as a State agency, and without their consent, has full recognition in American jurisprudence (see Cooley's Const. Lim. 247), and received the sanction of the High Court of Errors and Appeals in *Sutton et al.* v. *Board of Police,* 41 Miss. 236, and in *Chandler* v. *Bay St.*

*Louis*, 57 Miss. 326. In this last case it is said: " It is not possible for the officers of a municipal corporation to impose any liability upon the constituent body by their crimes and torts, even when committed *colore officii*, unless expressly authorized or subsequently ratified, or done in pursuance of some general authority on the subject-matter of their action. They may by such acts make themselves personally liable, but they impose no obligations on the public."

In all the cases on the subject of the liability of these corporations, it is admitted that the liability in each case depends on the true construction of the statute creating the corporation. The difference in the cases seems to be in the mode of arriving at the intention of the Legislature. In some it is held that the liability arises from the constitution of the body and the business it is charged with, if there be no restrictive language ; in others it is said there ought to be an express provision for liability before it can attach. In this case the meaning of the act seems to be clear. The tax is levied, as expressed in the statute, " for the purpose of repairing and constructing the levees, and for carrying into effect the object and purpose of securing the counties of Bolivar, Washington, and Issaquena from overflow from the Mississippi River." This does not include the very different object of paying damages for the default and misconduct of the persons charged with the execution of the act. This expression of the purpose of the tax in the act is an exclusion of all other purposes. If such damages were chargeable on the fund, their payment might prevent the accomplishment of the purpose for which the tax was levied. The whole fund might be consumed in compensating landowners for a failure to receive that protection from the levees which they were designed to afford. The taxes levied, instead of being a fund for securing this protection, would be converted, as was said by Lord Mansfield in an analogous case, into the capital of an insurance company to indemnify against losses from floods. The tax-payers would become insurers against damages, instead of contributors to a fund to be used

in preventing the recurrence of damages.    To entail so alarming a liability on property-holders without their free consent ought to require a very plain expression of the legislative will, if indeed there be any power in a free government thus to deal with the property and business of the people.    That a tax-payer living in the district should, on account of the negligence or misconduct of the persons administering the powers of the corporation, or their agents or employees, fail to receive the protection from overflow to secure which he was taxed, is indeed a hardship ; but we are not authorized to remove this hardship by the imposition of a burden on his co-sufferers. He must be left to his remedy against those by whose misconduct he was injured, whose liability for their own acts and omissions is to be determined by the rules of law applicable to such cases.

Judgment is affirmed.