## CALDWELL v. GUARDIAN TRUST CO. et al.

Circuit Court of Appeals, Eighth Circuit.
April 23, 1928.

No. 7795.

1. Parties ⟨⟩42—Right to intervene must be exercised promptly, and application not made until after judgment may be denied.

The right of intervention must be exercised promptly, and application may be denied, when not made until after judgment has been rendered.

2. Equity ⟨⟩114—Leave to intervene will not usually be granted after final decree.

Even in equity, it is unusual to grant leave to intervene after final decree.

3. Parties ⟨⟩40(2)—Intervener's interest must be direct and immediate.

To intervene in action, the interest of intervener must be direct and immediate, not remote.

4. Drains ⟨⟩20—Taxpayer's application for leave to intervene in action on bonds nearly month after judgment against drainage district held too late.

Where resident taxpayer, owning lands in drainage district, knew in July that suit was pending against district on bonds thereof, that payment due August 1 would not be made, and that supplemental complaint would be filed in such case, which was done August 12, his application on December 10, after entry of judgment against district on November 23, for leave to intervene, was too late, though delay was in reliance on promise of plaintiff's attorney to notify him when supplemental complaint was filed.

5. Drains ⟨⟩20—Taxpayer, asking leave to intervene after judgment against drainage district, held not entitled to set up district's counterclaim against holder, nor procedural irregularities in issuance of bonds sued on.

Drainage district's counterclaim or set-off against corporation, owning portion of district bonds sued on, and infirmities in such bonds, owing to irregularities in procedure by district, could not be set up as defenses by resident taxpayer, asking leave to intervene after judgment against district, in absence of showing of fraud or bad faith of district in not setting up such defenses, or request on and refusal by it to do so.

6. Drains ⟨⟩20—Leave to intervene after judgment against drainage district on bonds will not be granted taxpayer, so as to delay use of judgment on mandamus for higher tax levy to meet future maturities as desired by parties.

Motion of resident taxpayer for leave to intervene after judgment against drainage district in suit on bonds thereof and petition to

set aside judgment will not be granted, so as to delay use of judgment as foundation for mandamus proceeding to compel levy of higher rate of tax to meet future maturities of bonds and coupons, as desired by both plaintiff and district.

**7. Drains ☞17—Drainage district, receiving and retaining proceeds of drafts signed by officer, may be held to have ratified such signing.**

Drainage district, receiving and retaining proceeds of drafts for price of bonds sold may be held to have ratified signing of drafts by secretary of its board of directors, under rule that corporation may ratify its agents' or officers' unauthorized acts and contracts within scope of corporate powers.

**8. Drains ☞20—Proposed defense of applicant for leave to intervene after judgment against drainage district, that district had counterclaim against purchaser of bonds sued on for proceeds of draft deposited in bank which failed, held fatally defective.**

Defense, proposed to be set up by applicant for leave to intervene after judgment against drainage district in action on bonds thereof, that district had counterclaim or set-off against purchaser of portion of bonds for proceeds of drafts deposited in bank which failed, *held* fatally defective, as stating no cause of action against purchaser, in absence of allegation of contract, breach thereof, and resulting loss to district.

**9. Contracts ☞332(1)—To recover for breach of contract, pleading must allege contract, breach, and resulting loss.**

To recover for breach of contract, pleading must allege contract, breach thereof, and loss suffered by reason of such breach.

**10. Damages ☞23—Party breaking contract is liable only for damages proximately and naturally resulting, in absence of special facts known to parties at time of making contract.**

Party guilty of breach of contract is liable only for damages proximately and naturally resulting therefrom, in absence of special facts, known to parties at time of making contract, being responsible only for such consequences as may be reasonably supposed to be in contemplation of parties at such time.

**11. Drains ☞18—Purchasers of drainage district bonds from unknown holders in market are "holders in due course" (Crawford & Moses' Dig. Ark. §§ 7824, 7825).**

Purchaser of drainage district bonds from unknown holders in market, who are presumed to be bona fide holders, are "holders in due course," under Crawford & Moses' Dig. Ark. § 7825 (Negotiable Instruments Act, § 59), and section 7824.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Holder in Due Course.]

**12. Drains ☞18—That drainage district bonds were purchased on maturity date did not prevent purchasers from unknown holders in market from becoming holders in due course (Crawford & Moses' Dig. Ark. §§ 7824, 7825, 7852).**

That purchase of drainage district bonds from unknown holders in market was made on day of maturity thereof did not prevent purchasers from becoming holders in due course, under Crawford & Moses' Dig. Ark. §§ 7824, 7825, 7852.

**13. Drains ☞18—That drainage district bonds sued on were originally sold at discount without notice held immaterial (Acts Ark. 1917, p. 485).**

That drainage district bonds were originally sold at discount and without notice *held* immaterial in action thereon; Acts Ark. 1917, p. 485, making no requirements to contrary.

**14. Drains ☞18—Recitals in drainage district bonds that everything required had been done estopped district to set up mere procedural irregularities.**

Recitals in drainage district bonds that all acts, conditions, and things required to be done in issuing bonds, including organization of district, adjudication of benefits and damages, and levying of tax, had been done as required by law, estopped district to set up mere irregularities in attempt to render bonds invalid.

**15. Drains ☞18—Irregularities in exclusion and inclusion of certain tract under original and modified drainage plans and specifications held cured by statute (Acts Ark. 1917, p. 485; 43 USCA §§ 1041–1048; Acts Ark. 1920 (Ex. Sess.), p. 2585, §§ 1, 3).**

Any irregularities in exclusion of certain tract from assessment of benefits and award of damages under original plans and specifications on which first issue of drainage district bonds was made, under Acts Ark. 1917, p. 485, and inclusion thereof with assessment of benefits and award of damages under modified plans and specifications, pursuant to which second issue was made, after enactment of act Cong. Jan. 17, 1920 (43 USCA §§ 1041–1048), changing status of public lands in such tract, *held* cured by Acts Ark. 1920 (Ex. Sess.), p. 2585, §§ 1, 3.

**16. Drains ☞82(1)—It must be presumed that drainage district, through officers, properly exercised power to change plans, make new assessments, and readjust assessments, and hence assessed benefits on entire lands of district, based on improvements as unit (Acts Ark. 1920 (Ex. Sess.), p. 2585, § 3, amending Acts 1917, p. 494, § 7).**

It must be presumed that drainage district, through its officers, properly exercised power conferred by Acts Ark. 1920 (Ex. Sess.), p. 2585, § 3, amending Acts 1917, p. 494, § 7, to change plans, make new assessments, and readjust assessments, and hence assessed benefits on entire land of district, based on improvements considered as unit, as against objection that original assessment of benefits disregarded certain tract, while assessment after modification of plans referred only to such tract.

**17. Drains ☞18—Drainage district's failure to change plans, make new assessments, and readjust assessments, as authorized by statute, would not invalidate bonds in hands of holders in due course (Acts Ark. 1920 (Ex. Sess.), p. 2585, § 3, amending Acts 1917, p. 494, § 7; 43 USCA §§ 1041–1048).**

Failure of drainage district officers to change plans, make new assessments, and readjust assessments, as authorized by Acts Ark. 1920 (Ex. Sess.), p. 2585, § 3, amending Acts

1917, p. 494, § 7, so as to include tract excluded under original plans, on which first bond issue was made, before enactment of Act Cong. Jan. 17, 1920 (43 USCA §§ 1041–1048), changing status of public lands in such tract, would not be fatal to validity of bonds in hands of holders in due course.

**18. Drains ⊙⇒2(3)—Statute curing defects in drainage district proceedings held to include city improvement (Acts Ark. 1920 (Ex. Sess.), p. 2585, § 1).**

Acts Ark. 1920 (Ex. Sess.), p. 2585, § 1, curing all defects in drainage district proceedings, including modification of plans, addition of territory, and assessment of benefits and damages, *held* broad enough to include improvements in city for which plans were made by district long before passage of such act.

**19. Drains ⊙⇒2(1)—Legislature had power to ratify making of city improvement by drainage district (Acts Ark. 1920 (Ex. Sess.), p. 2585, § 1).**

General Assembly of Arkansas had power to ratify by Acts Ark. 1920 (Ex. Sess.), p. 2585, § 1, making of improvement in city within drainage district by such district, as related to improvements outside city.

**20. Drains ⊙⇒18—That amount spent by drainage district for city improvement was too great, or amount assessed against city realty too little, would not invalidate district bonds.**

Whether amount spent by drainage district for improvement within city was too great, or amount assessed against city realty for benefits too little, relate to mere matters of detail, which would not render district bonds invalid.

**21. Municipal corporations ⊙⇒943(1)—Municipality may estop itself by recitals in bonds from denying facts or circumstances authorizing issuance thereof.**

If there be any facts or circumstances under which municipality may lawfully issue bonds, it may estop itself by recitals therein from denying existence of such facts or circumstances and its power to issue them, unless Constitution or act under which bonds are issued prescribes some public record as test.

**22. Municipal corporations ⊙⇒943(3)—Recitals in municipal bonds that legal requirements were complied with precludes inquiry as against innocent purchasers for value as to whether condition precedent to issuance thereof was performed.**

Recitals in municipal bonds by officer or representative body, empowered to perform condition precedent and determine when it has been performed, that all legal requirements necessary to authorize issuance of bonds have been complied with, precludes inquiry, as against innocent purchaser for value, as to whether such condition was performed before bonds were issued.

In Error to the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Action by the Guardian Trust Company against Drainage District No. 17 of Mississippi County, Ark., and others, in which Clin-ton L. Caldwell filed a motion for leave to intervene after a judgment for plaintiff. To review an order denying the motion, movant brings error. Affirmed.

Robert E. Wiley, of Little Rock, Ark., for plaintiff in error.

Charles D. Frierson, of Jonesboro, Ark., for defendants in error.

Before WALTER H. SANBORN and BOOTH, Circuit Judges, and MUNGER, District Judge.

BOOTH, Circuit Judge. This is a writ of error to review an order denying a motion to intervene in a law action for the purpose of filing therein a petition (1) to set aside the judgment theretofore entered; and (2) to interpose an answer setting up certain alleged defenses to the complaint. The proposed defenses were set out at length in the petition. The motion was heard upon the motion papers, a response thereto by plaintiff, and certain testimony taken at the hearing, which the court ordered to be considered as affidavits. The court, in denying the motion, found that no valid defense was shown by the petition.

The facts which led up to the motion to intervene are substantially as follows:

Drainage district No. 17 of Mississippi county, Ark., was created by Act No. 103 of the session of the General Assembly of the state of Arkansas of 1917, approved February 20, 1917. The act appointed and constituted three persons, naming them, a board of directors of the district, and provided that they and their successors should constitute and be a corporate body by the name of drainage district No. 17. The act in general terms authorized the district to reclaim and improve the lands in a named territory in Mississippi county, Ark., by the construction of ditches, levees, and appurtenances; the improvements to be paid for by assessments of benefits to the lands. The act also authorized the district to issue bonds to procure money to construct the improvements. February 4, 1918, a first issue of bonds was made, amounting in par value to $1,682,500.

Included within the named limits of the district were certain public lands, some unentered, some embraced in unpatented entries. These lands were not subject to the laws of Arkansas relating to drainage districts. Accordingly, the first plans of drainage district No. 17 did not embrace improvements to said lands nor assessments of benefits against them. The portion of the district to which the improvements and assessments

under the first plan did not extend, was known as the "Big Lake Area," and included the public lands above mentioned. This Big Lake area constituted about 15,000 acres of the 150,000 acres, more or less, included within the drainage district.

January 17, 1920, an act of Congress was passed subjecting the public lands above mentioned to the drainage laws of Arkansas with certain conditions attached. 41 Stat. 392 (43 USCA §§ 1041–1048). The plans of the drainage district were thereafter modified, and the Big Lake area was accorded improvements and subjected to assessments. February 23, 1920, the General Assembly of Arkansas passed a curative act relative to drainage district No. 17. Acts 1920 (Ex. Sess.), p. 2585. Included among other provisions were the following:

"Section 1. That all the proceedings of drainage district number 17, of Mississippi county, Arkansas, including the modification of the plans of said improvement, the addition of territory thereto, the assessment of benefits and damages as modified and the levy of special assessments thereon and all proceedings, judgments and orders heretofore rendered by the county court of Mississippi county in regard to said district be and the same are hereby confirmed, cured and established, and all the assessments of benefits and damages as modified and now appearing on the assessment roll as the assessment for the district are hereby found and declared to be equitable and just and are confirmed, and all defects therein cured and that all such proceedings, judgments, plans, assessments and levies and the contracts and sale of bonds by the directors, and all proceedings and all resolutions and other acts in pursuance thereof be and the same are hereby declared valid and effectual for all purposes, and the limitations on the increase of cost under the changed plans is hereby expressly removed."

"Section 3. That section 7 of Act 103 of the regular session of 1917 of the General Assembly of Arkansas be and the same is hereby amended to read as follows, to wit:

" 'That the board of directors may amend, alter, modify, take from or add to the plans of the work in said district at any time, before or during the progress or after the completion of the work of said district. * * *

" 'It shall be the duty of the board to view the lands affected by any change of plans, and if they find that lands not theretofore assessed have been benefited or damaged or that the benefits or damages to lands theretofore assessed have become inequitable they shall proceed to assess or reassess the benefits or damages to said lands. * * *

" ' * * * In no event shall a reduction of the total assessment of benefits of the whole district be made that will substantially lower the security of outstanding bonds of said district.' "

A second issue of bonds was found to be necessary by the board of directors of the drainage district after the modification of the plans. Accordingly bonds were issued bearing date August 2, 1920, amounting in the aggregate to $2,300,000. The improvements were made, and taxes were levied annually, pursuant to the act creating the drainage district, to meet the accruing interest and to provide for maturing bonds. Owing to the failure of many landowners to pay their taxes and for various other reasons, the amounts collected were not sufficient to meet the maturing obligations. The district failed to pay the coupons due February 1, 1926, and the defendant in error, the Guardian Trust Company (formerly Guardian Savings & Trust Company) of Cleveland, Ohio, who was the trustee under both issues of bonds, took over on behalf of bondholders said coupons from the paying agent (Chase National Bank of New York) with the consent of the district. The amount of the coupons so taken over by the Guardian Trust Company was $80,000, being $28,736 upon the first issue and $51,264 upon the second issue.

June 1, 1926, an action at law was commenced in the United States District Court for the Eastern District of Arkansas by the trust company against the drainage district and its three directors to collect the $80,000, with interest and costs. While the action was still pending, on or about June 9, 1926, the district paid the principal sum sued for, to wit, $80,000. The district filed no pleading, and the action remained pending in court.

August 1, 1926, further bonds and coupons matured under each issue. The district could not pay the total amount due on that date. Thereupon certain bond houses in St. Louis and Chicago, which had handled the bonds at the time of issue, with the knowledge and consent of the drainage district, purchased from the fiscal paying agent of the district (the Chase National Bank) bonds and coupons due August 1, 1926, in the total amount of $69,000, being $27,600 of the first issue and $41,400 of the second issue. These bonds and coupons were turned over to the trust company for the purpose of obtaining judgment against the drainage district.

Thereafter, on August 12, 1926, the trust company filed a supplemental complaint in the suit still pending in the United States

District Court for the Eastern District of Arkansas, setting up the foregoing facts and praying judgment against the drainage district for $69,000, together with interest and costs of the suit. Out of abundant caution, service was made anew upon the directors of the drainage district. No answer or other pleading was interposed by the district or the directors.

The cause came on for hearing in open court on November 23, 1926. The court found that the defendants had been duly and personally served with process and had made default; that the allegations of the complaint and supplemental complaint were true. Judgment was accordingly entered against the drainage district in the sum of $69,000, with interest since August 1, 1926, together with costs of the action. After all this had been done, and on the 10th of December, 1926, Clinton L. Caldwell, plaintiff in error, filed his motion for leave to intervene. As heretofore stated, the motion was denied.

The main question presented by the writ of error is whether this action by the court constituted error. The Arkansas statute relating to intervention reads as follows:

"Sec. 1102. *Persons interested may apply.*—Where, in an action for the recovery of real or personal property, any person having an interest in the property applies to be made a party, the court may order it to be done." Crawford & Moses' Digest Stat. of Ark. 1921.

It may be doubted whether this provision authorizes intervention in an action at law for the recovery of money only. However, we do not find it necessary to pass upon the point, and shall not do so, inasmuch as the question has not been fully presented by counsel.

[1] But the right of intervention is one which must be exercised promptly. The application may properly be denied, when not made until after judgment has been rendered. 11 Encyc. Pl. & Pr. 503; Owens v. Colgan, 97 Cal. 454, 32 P. 519; Laugenour v. Shanklin, 57 Cal. 70; Henry, Lee & Co. v. Cass Co., etc., Co., 42 Iowa, 33; Leon First Nat. Bank v. Gill & Co., 50 Iowa, 425; Henderson v. Farmers', etc., Bank, 199 Iowa, 1156, 200 N. W. 581; Meadows v. Goff, 90 Ky. 540, 14 S. W. 535; Hicklin v. Neb. City Nat. Bank, 8 Neb. 463, 467, 1 N. W. 135; Porter v. Knapp, 37 S. D. 279, 157 N. W. 988; Youngberg v. Youngberg, 44 S. D. 1, 181 N. W. 835. See State v. Farmers' State Bank, 103 Neb. 194, 170 N. W. 901.

[2] Even in equity it is unusual to grant leave to intervene after final decree. 21 C.

J. § 346, p. 345; Engdahl v. Laverty, 110 Neb. 672, 194 N. W. 862.

[3] And the interest of the intervener must be direct and immediate, not remote. City of Grand Rapids v. Consumers' Power Co., 216 Mich. 409, 185 N. W. 852; 20 R. C. L. 685; Latham v. C., B. & Q. R. Co., 100 Neb. 173, 158 N. W. 923.

[4] In the case at bar, Caldwell, the would-be intervener, was a resident taxpayer owning lands in the drainage district. He knew of the pendency of the suit against the district as early as some time in July, 1926. He knew that payment of the bonds and coupons falling due August 1, 1926, would not be made. He so advised the attorney for plaintiff. He knew that, if such default did occur, a supplemental complaint would be filed. He was so advised by the attorney for plaintiff. The default did occur, and the supplemental complaint was filed August 12, 1926. Judgment was not entered until November 23, 1926. The motion for leave to intervene was not filed until December 10, 1926, and the petition setting up the proposed defenses not until December 18, 1926.

The excuse offered by intervener for not filing his application sooner was that he was relying upon a promise of plaintiff's attorney to notify him when the supplemental complaint was filed. In view of the knowledge of the situation which the intervener had, we think the excuse is insufficient, and that his application came too late.

[5] Furthermore, the alleged defenses sought to be set up did not belong properly to the intervener, but to the drainage district. There is no showing or allegation that there was any fraud or bad faith on the part of the drainage district in not setting up the alleged defenses. Nor is there any showing or allegation that a request had been made on the drainage district to set up the alleged defenses, or that it had refused so to do.

Orderly procedure would seem to have required that Caldwell, a taxpayer and resident of the drainage district, having full knowledge of the action against the district upon the bonds, and having knowledge of facts which he claimed constituted defenses to the action, should request the officers of the district to interpose such defenses, instead of himself waiting until after entry of judgment and then seeking to set aside the judgment and set up the defenses.

[6] Finally it is apparent that a granting of the motion and a granting of the petition to set aside the judgment would greatly delay the procedure, which was apparently desired both by the plaintiff and the drainage

district, viz. to use the judgment as a foundation for a mandamus proceeding to compel the levy of a higher rate of tax in order to meet future maturities of bonds and coupons as they should fall due. Under all the circumstances, we think that a proper procedural showing for intervention was not made. [7-10] But we do not wish to place our decision upon procedural grounds alone, and we therefore turn to the merits of the defenses proposed to be set up by the would-be intervener. These defenses were three in number: First, that Otis & Co., of Cleveland, Ohio, were the owners of a portion of the bonds which were sued upon in the present action, and therefore one of the beneficiaries of the suit; that the drainage district had a counterclaim or offset against Otis & Co., which should be set up to prevent a judgment against the drainage district on behalf of Otis & Co. The claim of the drainage district against Otis & Co. was alleged to have arisen in the following way:

At the time of the first issue of bonds by the district in 1918, Otis & Co. were the purchasers of the bonds. By agreement with the district, Otis & Co. were to pay for the bonds by honoring drafts drawn from time to time by the district, signed by the president of the board of directors. Some of the drafts sent to Otis & Co. and honored by that company were signed, not by the president of the board of directors, but by one Russell, secretary of the board, who was also a director. Proceeds of the drafts signed by Russell were deposited in the Bank of Blytheville, of Blytheville, Ark., amounting to upwards of $200,000. All this took place prior to March 10, 1920. The bank ultimately failed, and the drainage district lost by the failure $75,000. Plaintiff in error contends that a valid claim of $75,000 thus arose against Otis & Co. It is pointed out by defendants in error that the cause of action against Otis & Co., if one ever existed, arose more than six years prior to the commencement of the present action, and that the drainage district could therefore maintain no suit on the alleged cause of action. It is contended, however, by plaintiff in error, that this bar of the statute of limitations would not prevent the claim being used as an offset under the law of Arkansas. See Huggins v. Smith, 141 Ark. 87, 92, 216 S. W. 1 (16 A. L. R. 323). It is also to be noted that the drainage district has received and retained $125,000 proceeds of the drafts signed by Russell, and may therefore be held to have ratified such signing of the drafts, under the well-recognized rule that a corporation may ratify the unauthorized acts

and contracts of its agents or officers which are within the scope of the corporate powers. 2 Dillon Municipal Corporations, § 797; Scott Co., Ark., v. Advance-Rumley, etc., Co., 288 F. 739 (C. C. A. 8) 36 A. L. R. 937.

But the fatal defect in this proposed defense is that the alleged set-off or counterclaim stated no cause of action against Otis & Co. The basis of the cause of action was breach of contract. It was necessary, therefore, that the pleading should allege the contract, the breach thereof by Otis & Co., and that the drainage district suffered loss by reason of the breach. For its breach of contract Otis & Co. would be liable for damages proximately and naturally resulting from the breach, and for such only, in the absence of special facts known to the parties at the time. 17 C. J. pp. 734, 735, §§ 71, 72; Greenfield v. Globe Automatic Sprinkler Co. (C. C. A.) 285 F. 27; Schaeffer, etc., Co. v. National, etc., Co. (C. C. A.) 148 F. 159. Or, as often stated, "a person can only be held to be responsible for such consequences as may be reasonably supposed to be in the contemplation of the parties at the time of making the contract." Globe Ref. Co. v. Landa, etc., Co., 190 U. S. 540, 544, 23 S. Ct. 754, 755 (47 S. Ct. 1171); Stebbins v. Selig, 257 F. 230 (C. C. A. 8).

In pleading the alleged counterclaim, the would-be intervener alleged the making of a contract between the drainage district and Otis & Co., and a breach of the contract. In pleading that damages had resulted, he went into particulars and stated just how the loss had occurred, viz. by the money being deposited in the Blytheville Bank after it was paid over by Otis & Co., and by the failure of the bank. The particulars thus pleaded showed conclusively as a matter of law that the damages sought were not such as could be recovered under the rules of damages above stated. The result was a failure to state a cause of action against Otis & Co.

The other two alleged defenses relate to so-called "infirmities" in the bonds of both issues, owing to "irregularities" in procedure by the drainage district. The first relates to the alleged "exclusion" of about 15,000 acres (the Big Lake tract) from assessment of benefits and award of damages under the original plans and specifications under which the first issue of bonds was made, and to the "inclusion" of the same tract with assessment of benefits and award of damages under the modified plans and specifications, under which the second issue of bonds was made.

The reason why improvements were not made affecting the Big Lake tract by the

plans and specifications as originally drawn, the act of Congress changing the status of public lands in that tract, the resulting modification in the plans and specifications, and the curative act of the General Assembly of the state of Arkansas, have all been heretofore stated and explained. The effect of the act of Congress, the scope and effect of the curative act, the validity of the proceedings of the drainage district pursuant to those acts, have been passed upon by the Supreme Court of Arkansas in Pierce v. Drainage District No. 17, 155 Ark. 89, 244 S. W. 342. In its opinion the court said:

"It is very earnestly insisted that appellants' lands were not included in the original assessments of benefits, for the reason that at the time those assessments were made the Congress had not consented to the assesment of the government lands lying within the district, and that the drainage act conferred no authority for the assessment of these lands, which was made after the act of Congress was passed. It appears, however, that after the passage of the act of Congress, the General Assembly of this state, on February 23, 1920, passed an act, No. 305, providing for a modification of the plans of the district and for a reassessment of benefits. The provisions of this last act, which will not be set out, as they are similar to numerous other acts which have been upheld by this court, appear to be sufficiently comprehensive to answer the objection that no authority existed for the assessment of appellants' lands."

See, also, Chicago, etc., Co. v. Drainage District No. 17, 172 Ark. 1059, 291 S. W. 810.

The other defense is based upon alleged irregularities relative to certain improvements in the city of Blytheville. It is alleged in substance that the city lies within the drainage district; that the assessed value of realty within the city for purposes of general taxation exceeds the assessed value of the lands outside; that the board of directors of the drainage district assessed benefits to lands outside the city to the amount of $4,974,209, while it assessed benefits to realty in the city to the amount of only $69,673; that the original plans and specifications provided for one improvement in the city—improvement 34—the construction of a storm sewer; that no change of plans relative to said improvements was filed, and no notice of any change of plan was given; that said improvement was not constructed, but in lieu thereof a "concrete conduit or sewer" was constructed "over the same eight-tenths mile course prescribed in said improvement unit,"

and of different dimensions, also that a small ditch about a mile in length was constructed, for all of which was paid the sum of $77,-739.66; that said improvement 34 was not authorized by the act creating the drainage district, since the word "ditches" in the act did not include sewers. It was alleged, further, in the petition of the would-be intervener that the plaintiff Guardian Trust Company and Otis & Co. and the other beneficiaries for whom the present suit is being carried on, were charged with notice of the "illegalities and infirmities" set forth.

[11] At this point it should be noted in respect to both of the foregoing defenses that the owners of the bonds, Otis & Co. and others, for whom the present suit was brought, are holders in due course of these negotiable instruments. They are such, first, by reason of the presumption arising under section 59 of the Negotiable Instruments Act (section 7825, Crawford & Moses' Digest Stat. of Ark. 1921), which reads as follows: "Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. But the last mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title" (see, also, Presidio Co. v. Noel-Young Bond Co., 212 U. S. 58, 29 S. Ct. 237, 53 L. Ed. 402; San Antonio v. Mehaffy, 96 U. S. 312, 24 L. Ed. 816); and, secondly, because they bought from unknown holders in the market, who are presumed to be bona fide holders, and succeeded to the rights of such holders. Crawford & Moses' Digest Stat. of Ark. 1921, § 7824; 8 C. J. pp. 466, 468, § 685; Montclair Tp. v. Ramsdell, 107 U. S. 147, 2 S. Ct. 391, 27 L. Ed. 431; Gunnison County Commissioners v. Rollins & Sons, 173 U. S. 255, 19 S. Ct. 390, 43 L. Ed. 689; Scotland Co., Mo., v. Hill, 132 U. S. 107, 10 S. Ct. 26, 33 L. Ed. 261; Cromwell v. Sac Co., Iowa, 96 U. S. 51, 24 L. Ed. 681; Commissioners of Marion County v. Clark, 94 U. S. 278, 24 L. Ed. 59; Commissioners of Douglas County v. Bolles, 94 U. S. 104, 24 L. Ed. 46.

[12] The fact that the purchase of the bonds was made by the present owners on the day of maturity did not prevent the purchasers from becoming holders in due course. 8 C. J. p. 403, § 596; Haug v. Riley, 101 Ga. 372, 29 S. E. 44, 40 L. R. A. 244; Farrell v. Lovett, 68 Me. 326, 28 Am. Rep. 59. See,

also, provisions of Negotiable Instruments Act (Crawford & Moses' Digest Stat. of Ark. 1921, § 7852).

[13] The fact that the bonds were originally sold at a discount and without notice of sale is immaterial. The statute made no requirements to the contrary.

[14] It is to be still further noted in connection with both of the alleged defenses that the bonds in the second issue contained the following recitals:

"This bond is one of a series of like tenor and effect, except as to maturity, aggregating two million three hundred thousand dollars ($2,300,000.00), numbered from one (1) to twenty-three hundred (2,300), inclusive, issued for the purpose of hastening the work of constructing a system of drainage in said drainage district, under and pursuant to and in full compliance with the Constitution and laws of the state of Arkansas, including, among others, Act No. 103 of the General Assembly of the State of Arkansas of the year 1917, entitled 'An act to organize a drainage and levee district in Mississippi county to be known as drainage district No. 17, for the purpose of reclaiming the lands therein by drainage ditches and levees, and to enable said district to borrow money; for the purpose of abolishing the Keystone drainage district and for other purposes'—approved February 20, 1917, and Act No. 305 of the Extraordinary Session of said General Assembly of the year 1920, entitled 'An act to cure, confirm and establish the proceedings of drainage district No. 17 of Mississippi county, Arkansas, of all assessments and modifications of assessments therein, and all judgments regarding said district, and to amend Act No. 103 of the General Assembly at the regular session of 1917, and for other purposes,' approved February 23, 1920, and under and in full compliance with orders, resolutions and proceedings of the county court of said county and the board of directors of said drainage district duly and legally had and adopted. This bond and attached interest coupons, as well as other bonds and coupons forming a part of this issue, are payable out of the proceeds of taxes heretofore legally levied upon the real property, town lots, railroads and tramroads embraced within said district and benefited by said improvement, and is secured by a prior tax lien on all of said real property, town lots, railroads and tramroads.

"The drainage district hereby covenants that said district is duly and legally existing as a drainage district under the Constitution and laws of the state of Arkansas; that the

real property, town lots, railroads and tramroads within the district have been duly assessed for the making of said improvement as required by law; that all acts, conditions and things required to be done, precedent to and in the issuing of this bond, including the organization of said district, the adjudication of the benefits and damages against the real property, town lots, railroads and tramroads therein and levying the drainage tax, have been done, have happened and have been performed in regular and due form as required by law."

Bonds of the first issue contained similar recitals. The effect of such recitals as an estoppel against the corporation issuing the bonds to set up mere irregularities in an attempt to render the bonds invalid has been passed upon many times by the courts. The following are but a few of the leading cases: Presidio County v. Noel-Young Bond Co., supra; Commissioners v. Rollins & Sons, supra; City of Evansville v. Dennett, 161 U. S. 434, 16 S. Ct. 613, 40 L. Ed. 760; Sherman Co., Neb., v. Simonds, 109 U. S. 735, 3 S. Ct. 502, 27 L. Ed. 1093; Thompson v. Perrine, 103 U. S. 806, 26 L. Ed. 612; Pompton Twp. v. Cooper Union, 101 U. S. 196, 25 L. Ed. 803; Nauvoo v. Ritter, 97 U. S. 389, 24 L. Ed. 1050; Macon Co., Mo., v. Shores, 97 U. S. 272, 24 L. Ed. 889; San Antonio v. Mehaffy, supra; City of Lexington v. Butler, 14 Wall. 282, 20 L. Ed. 809; Marshall County v. Schenck, 5 Wall. 772, 18 L. Ed. 556; Myer v. City of Muscatine, 1 Wall. 384, 17 L. Ed. 564; Gelpcke v. City of Dubuque, 1 Wall. 175, 17 L. Ed. 520; Tyler Co., Tex., v. Branch-Middlekauff Co. (C. C. A.) 20 F.(2d) 504; City of Gainesville v. Brown-Crummer Co. (C. C. A.) 20 F.(2d) 497; Road Imp. Dist. 7 v. Guardian Sav. & Tr. Co., 8 F.(2d) 932 (C. C. A. 8); Town of Aurora v. Gates, 208 F. 101 (C. C. A. 8) L. R. A. 1915A, 910, and note. In the recent case of Road Imp. Dist. 7 v. Guardian Sav. & Tr. Co., supra, this court, speaking by Circuit Judge Sanborn, said:

"Under the Constitution of the United States and the Constitution and statutes of Arkansas, this road district and its officers had plenary authority to have obviated every one of the objections now under consideration, to have made the assessment, the levy of taxes, and all proceedings legal and valid, and to have made its certificate in its bonds and mortgage true. It obtained the money of Otis & Co. on this certificate that it had done so, and neither it nor the owners of the property in its district assessed, which it represented in its sale of these bonds, can

26 F.(2d)—15

now be permitted to defeat this suit of the purchasers to collect them by such defects in their proceedings as are now under consideration, on the ground that they made them illegal or invalid and their certificate false."

The Curative Act of February 23, 1920.

[15] Furthermore, the curative act of February, 1920, in our opinion, meets every objection raised by the would-be intervener as to the changes in the plans of the drainage district, and as to the Blytheville improvement. The general principle underlying curative acts was stated by the Supreme Court in Thomson v. Lee Co., Iowa, 3 Wall. 327, 331 (18 L. Ed. 177), as follows: "If the Legislature possessed the power to authorize the act to be done, it could, by a retrospective act, cure the evils which existed, because the power thus conferred had been irregularly executed."

Such acts are not uncommon in Arkansas. As stated above, this curative statute has been twice before the Supreme Court of Arkansas, and has been sustained and liberally construed to effect its evident purpose. In Chicago, etc., Co. v. Drainage District No. 17, supra, the court in its opinion said:

"This special act [original Drainage District Act] was amended at the extra session of the General Assembly of 1920 by an act (No. 305) approved February 23, 1920. The amendatory act enlarged the district and cured all defects in the proceedings leading up to the organization of the district, confirmed all judgments, assessments and contracts, and removed the limitation on the cost of the improvement and made all betterments bear interest at the rate of 6 per cent., and provided that interest on the bonds should not be considered as a part of the cost of the improvement and should be collected in addition to the benefits. Pursuant to the authority conferred by the amendatory act, plans were prepared to afford drainage to what is known as the Big Lake area, and certain other changes in the plans were made and benefits were reassessed. Bonds dated August 2, 1920, aggregating $2,300,000, were issued in addition to those previously issued. Taxes were levied on the changed and corrected benefits to take care of the principal and interest on both issues of bonds maturing after that date."

[16] It is one of the contentions of plaintiff in error that the assessment of benefits in the first instance disregarded the Big Lake area, and was therefore void; that the assessment of benefits after the plans were modified was in reference to the Big Lake area alone, and was therefore void; that there has never been any assessment of benefits on the entire lands of the district based upon the improvements considered as a unit. This contention fails to give full effect to the provisions of the act of February, 1920. That act had a two-fold character: It was not only a curative act, dealing with the past; but it was also an amendatory act, dealing with the future. As a curative act it healed whatever irregularities, if any, had taken place in reference to the first issue of bonds. As an amendatory act it authorized changes of plans and new assessments and readjusted assessments. Presumably the drainage district through its officers properly exercised this new power. If they did, there was an assessment of benefits on the entire lands of the district based upon the improvements considered as a unit.

[17] But even if the officers of the drainage district did not proceed under the curative and amendatory act of February, 1920, as above indicated, the bonds, both of the first and second issues, would not, because of such failure, be invalid in the hands of holders in due course. If the power to take the proper steps existed, irregularities in taking the steps would not be fatal to the validity of the bonds in the hands of holders in due course. The case of Thornton v. Road Imp. Dist. 1, 291 F. 518 (C. C. A. 8), is cited by plaintiff in error. That case did not involve the validity of bonds in the hands of holders in due course. It was a suit by taxpayers directly against the road improvement district for equitable relief against the enforcement of a grossly arbitrary, disproportionate, and excessive assessment of benefits. The principles governing such a suit are entirely different from those governing the case at bar.

[18-20] As to the Blytheville improvement, it is to be noted that the plans for this improvement were made by the drainage district long prior to the passage of the curative act of February, 1920. The General Assembly, therefore, had the facts before it when it passed the curative act. The language of that act is broad enough to include the Blytheville improvement. The only question that would seem to remain is whether the General Assembly had the power to ratify the making of the Blytheville improvement. Blytheville was within the drainage district. Its realty was assessed for benefits accruing from the general improvements in the drainage district. Doubtless the officers of the drainage district thought the improvement in Blytheville and the improvements outside bore some relation to each other. In ratifying the acts

of the district, the General Assembly must have taken the same view. There is no showing in the proposed defense of the would-be intervener that such was not the case. Whether the amount spent for the Blytheville improvement was too great, whether the amount assessed against the Blytheville realty for benefits was too little, relate to mere matters of detail, which would not render the bonds invalid.

We think that the facts set up in the proposed defense relative to the Blytheville improvement fall far short of showing that the officers of the drainage district had no power to issue bonds for the payment of the improvements planned, including the Blytheville improvement, and fall still farther short of showing that the General Assembly could not or did not grant such power to the drainage district.

[21] Our conclusions are that the recitals in the bonds, together with the curative part of the act of February, 1920, negative every contention of plaintiff in error as to the first issue of bonds, and fully establish their validity in the hands of holders in due course; that the provisions of the amendatory part of the act of February, 1920, and the recitals in the bonds of the second issue, meet every contention of plaintiff in error in regard to those bonds, and fully establish their validity in the hands of holders in due course. In the case of Town of Aurora v. Gates, 208 F. 101, this court, speaking by Circuit Judge Sanborn, said (page 104):

"A municipality or a quasi municipality may not, by the recitals or certificates in its bonds, estop itself from denying that it is without power to issue them when the laws are such that there can be no state of facts or of circumstances under which it would have authority to emit them. But, if the laws are such that there might under any state of facts or of circumstances be lawful power in the municipality or quasi municipality to issue its bonds, it may, by recitals therein, estop itself from denying that those facts or circumstances exist and that it has lawful power to send them forth, unless the Constitution or act under which the bonds are issued prescribes some public record as the test, and no such test was prescribed in this case, of the existence of some of those facts or circumstances" citing many cases.

[22] And again (page 108):

"The recitals in municipal bonds by the officers or the representative body invested with power to perform a precedent condition and with authority to determine when that condition has been performed, that all the requirements of law necessary to authorize the issue of the bonds have been complied with, preclude inquiry, as against an innocent purchaser for value, whether or not the precedent condition had been performed before the bonds were issued"—citing many cases.

We think that the principles thus stated control the disposition of the case at bar. Having now considered the several defenses sought to be interposed by the would-be intervener, and finding none of them valid defenses to the cause of action set up in the complaint, we conclude that the motion to intervene was rightly denied upon the merits.

Order affirmed.