## In re DRAINAGE DIST. NO. 7 OF POINSETT COUNTY, ARK. (LUEHRMANN et al., Interveners).

District Court, E. D. Arkansas, Jonesboro Division.

Dec. 27, 1937.

Chas. D. Frierson, of Jonesboro, Ark., for petitioner.

Archer Wheatley and A. P. Patton, both of Jonesboro, Ark., for W. B. Chapman, trustee, representing majority creditors.

Vincent Miles, Sp. Asst. Atty. Gen., for the United States.

Chas. D. Long, of St. Louis, Mo., and J. B. Daggett, of Marianna, Ark., for objecting bondholders Luehrmann et al.

C. T. Carpenter, of Marked Tree, Ark., and J. T. Coston, of Osceola, Ark., for objecting creditor.

TRIMBLE, District Judge.

The petition of Drainage District No. 7 of Poinsett County, Arkansas, was filed on September 15, 1937, accompanied by the written consent of W. B. Chapman, trustee, claiming to be representative of more than 90 per cent. of the holders of the original bonds and coupons of the district, and also to be the owner and holder of more than 80 per cent. of the judgments against the district.

On October 2, 1937, I ordered a hearing to be set for December 17, 1937, and, pursuant to Public No. 302 of the 75th Congress, being an amendment to the Bankruptcy Act, containing chapter 10, sections 81–84, inclusive, approved August 16, 1937, 11 U.S.C.A. §§ 401–404, I directed the publication of a notice in a local news-

800

paper of Poinsett County, and also in the St. Louis Globe-Democrat, of St. Louis, Missouri, and also directed the clerk to mail out, at petitioners expense, copies of the notices to all creditors named in the petition and exhibits.

On December 17, 1937, the petitioner and objectors were ready to proceed, but this court was engaged in the trial of another cause and upon its own motion the hearing was continued to December 20th, at which time George E. W. Luehrmann and several other bondholders filed a motion to dismiss and, J. G. Haverstick, a judgment creditor, also filed a motion to dismiss, first being granted leave of court to withdraw the answer previously filed for the purpose of filing a motion, reserving the right to answer later if the motion to dismiss be overruled.

Being informed that the constitutionality of said debt composition act was drawn in question in this proceeding, I followed the provisions of Act of August 24, 1937, being Public 352 of the 75th Congress, 28 U.S.C.A. § 349a, which act provides that when the constitutionality of an act of Congress is drawn in question, and in the opinion of the court said question of constitutionality affects the public interests and that neither the United States nor any agency of the government is a party to said proceeding, the court shall notify the Attorney General and permit the United States to intervene, I rendered an order notifying the Attorney General, and the special assistant, acting for the Attorney General and being present in court, immediately waived the time granted for the filing of the intervention of the United States and filed the same forthwith.

And all the parties, including the United States by the Attorney General, the petitioner, the majority creditor, the objecting bondholders, and objecting judgment creditor, agreed that the first question necessary to decide was whether or not said amendment to the Bankruptcy Act containing chapter 10, sections 81 to 84, inclusive, 11 U.S.C.A. §§ 401–404, were constitutional, and all parties agreed that, in order to minimize costs and labor, the constitutionality of the act was the essential thing for speedy determination. The matter was argued very fully.

There is some repetition in the motions, but the various objections as to constitutionality are that the act is not a uniform law on the subject of bankruptcies; that it sets up an arbitrary definition of insolvency; that it transgresses section 8 of article 1 of the Constitution of the United States because it invades the sovereignty of the State of Arkansas and its governmental agencies; that it violates the Fifth Amendment because it authorizes taking of private property for public use without just compensation; that it permits a state agency to repudiate its debts; that it permits a state agency to impair its contract obligations; that it permits property to be taken without due process of law.

The petition recites that the district is a drainage district having also the power to construct levees and that its improvements are devoted chiefly to the reclamation and improvement of the lands therein for agricultural purposes, all of said lands within the district being located in Poinsett County and within this district, and the petitioner claims to be such an agency as is embraced within chapter 10, section 81, of Public 302, 11 U.S.C.A. § 401.

That a general financial depression has prevailed for several years, with adverse financial and agricultural conditions and with recurring floods, bank failures, and that the petitioner has been unable to collect taxes or special assessments, and the landowners have been unable to pay them and that the district has not been able to obtain sufficient revenues to meet its obligations as they mature, and in fact is insolvent and has been for several years last past.

That the principal asset of the district is the assessment of benefits levied on approval of the plans of the district against real estate therein, and all the funds of the district are derived from levies annually made against said assessment of benefits at a percentage rate thereof fixed in the order for said levy and from the proceeds of real estate forfeited under the law to the district in foreclosing the lien of said annual installments so levied against the benefits, and hence that all debts of the district are payable out of the same general fund.

That creditors owning not less than 90 per cent. of the bonds and coupons, and creditors owning not less than 88.5 per cent. in amount of the judgments and other evidences of indebtedness and securities of petitioner affected by the plan of composition, have accepted the plan in writing, which written acceptance and consent is attached as an exhibit. A list of creditors,

with addresses, was submitted. Following this the petition recites alleged facts as to certain particular claims of judgment creditors and other claimants.

The plan of composition was exhibited, and said plan recites the issuance of bonds at the dates and in the principal amounts set out below alleging that all said bonds are secured by a pledge upon the assessment of benefits and revenues of the district established against the real estate therein. The plan recites the financial and physical difficulties confronting the district, and particularly that it was necessary to construct an entire new outlet for the floodwaters of the district in order to preserve all the structures of the district for the interest of all parties, and that the Reconstruction Finance Corporation had advanced $235,000 to hasten the completion of said outlet, and also the Reconstruction Finance Corporation had granted an emergency loan for other necessary rehabilitation for the protection of the entire structures and that these loans of the Reconstruction Finance Corporation should have priority, dollar for dollar, but that the original bonds of the district are on a parity with each other, and that said bonds bear interest coupons in default over a period of many years.

The following lists the dates and amounts of the bonds affected by the plan:

| | |
|---|---|
| January 1, 1918 | $1,400,000.00 |
| August 1, 1919 | 2,200,000.00 |
| February 1, 1923 | 1,440,000.00 |
| December 1, 1924 | 150,000.00 |
| February 1, 1926 | 150,000.00 |
| | |
| Series A August 1, 1927 | 51,500.00 |
| Series B August 1, 1928 | 54,000.00 |
| Series C August 1, 1927 | 133,275.00 |
| Series D February 1, 1928 | 131,987.50 |
| Series E August 1, 1928 | 131,987.50 |
| Series F February 1, 1929 | 130,637.50 |

The plan further recites that twenty-five judgment creditors have obtained judgments on account of alleged damage to property or damages for the taking of property caused by the works of the district, such judgments aggregating $174,493.00 principal and bearing interest annually at 6 per cent. from date of judgment till paid. That judgment creditors to the extent of 88.5 per cent. in value of principal have accepted and consented to the composition and one judgment creditor holding a judgment for $20,000 and interest only has objected.

The plan offers to pay all bondholders (excepting the refunding and rehabilitation issues dated January 1, 1934, and January 1, 1937, which are payable in full and are not affected by the plan) the cash sum of 25.879 cents flat for each dollar of the principal amount of the bonds, exclusive of interest. That judgment creditors be paid the same rate of cash for the face of their judgments without interest. The source of payment is to be a loan for the benefit of the district by Reconstruction Finance Corporation and if the composition be approved, refunding bonds will be delivered to evidence the new debt structure and bearing 4 per cent. interest per annum maturing serially, according to schedule approved by Reconstruction Finance Corporation.

The exhibits show that Reconstruction Finance Corporation advanced funds to Louis V. Ritter, trustee, upon his note for the purchase of the old securities of the district, and it appears that approximately 98 per cent. in principal of the old securities have been bought by the said Louis V. Ritter, as trustee, or by his successor, W. B. Chapman, all of which old securities are held as collateral to support the loan to the trustee for the purchase.

The majority judgment creditors, twenty-four in number (and excluding the objecting creditor, Haverstick), have assigned and transferred their judgments, aggregating 88.5 per cent. of all judgments against the district, to Louis V. Ritter, who is succeeded by W. B. Chapman, as trustee.

Apparently the intention of the trustee and of the Bondholders' Protective Committee, and of the district and of the Reconstruction Finance Corporation, was to hold all the outstanding indebtedness of the district purchased by the trustee in force until the debt composition plan could be established and completed, and it will be noted that section 82 of the act, 11 U.S.C.A. § 402, under "Definitions," states that "any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of the full face value thereof."

In this particular case, however, no agency of the government holds the old securities, but they are in fact held by a trustee who appears to have taken over legal title from the original bondholders, the larger portion of whom transferred the

bonds to the trustee through the agency of the Bondholders' Protective Committee. Other bonds purchased later went into the hands of the trustees by the act of the original bondholders in delivering the bonds to the trustee, and were placed as collateral to the trustee's note, just as in the first instance. The judgment creditors assigned their judgments without recourse direct to the trustee. For the effect of such transactions petitioner cited in argument: Ketchum v. Duncan, 96 U.S. 659, 24 L.Ed. 868; Slupsky v. Westinghouse Electric & Mfg. Co., 8 Cir., 78 F.2d 13.

I find in the records of this court a proceeding of a similar nature filed by this drainage district July 12, 1934, under the original "Municipal Bankruptcy Act" of Congress, of May 24, 1934, being sections 78, 79, and 80 amendatory to the general Bankruptcy Act, 48 Stat. 798, title 11 U.S. C.A. §§ 301, 302, and 303, which act was declared unconstitutional by the majority opinion of the Supreme Court of the United States in the case of Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309.

The court records reflect that the late Judge Martineau, a judge of the highest ability and learning, held that act to be constitutional and that very elaborate hearings were had upon all the claims and interventions and before a special master, and that upon the report of the special master Judge Martineau rendered a decree upholding the debt readjustment plan or composition in every respect.

Very shortly after his decision, however, the Supreme Court of the United States rendered the opinion in the Ashton Case holding the act to be unconstitutional, and hence Judge Martineau later set aside his decree, and at a still later date that petition under the former act was dismissed by the petitioner. However, Judge Martineau had filed therein a very complete statement and findings of fact based upon the self-same issues that will apparently be raised in the present case.

The new act has a saving clause providing that the initiation of proceedings or filing of petition under the former act shall not constitute a bar to the same taxing agency in initiating a new proceeding under the present act.

In considering the question of the constitutionality of the present act, I need not search all the numerous authorities cited, because the decision of the majority in the Ashton Case impliedly treats even the original act as being an act on the subject of bankruptcy and raised no question of its uniformity. The dissenting opinion of Justice Cardozo in the Ashton Case likewise states the act is uniform to those who have capacity to take advantage of it.

There was much argument before me over the status of the drainage district, as to whether it was an arm of the state or a "political subdivision" as the Cameron County Water District was held to be in the Ashton Case, or whether it was a quasi public corporation constituting a mere agency of property owners for particular limited purposes.

The argument was advanced by objectors that the district was necessarily a "political subdivision" of the state because of the holding in the Ashton Case supported by the citation to Houck v. Little River Drainage District, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266.

In California, District Judge Yankwich, in passing upon the new act, has held in the Matter of Petition of Lindsay-Strathmore Irrigation District, D.C., 21 F.Supp. 129, that such an irrigation district is a political subdivision and he cites a number of California cases as supporting that view. Hence he held that the decision of the Supreme Court in the Ashton Case was binding upon him as District Judge and, because he construed the decision in the Ashton Case to be a bar to any act of Congress that would permit a political subdivision to make a composition of its debts in bankruptcy, and because furthermore he considered the irrigation district to be such a political subdivision under the laws of California, the judge felt constrained to hold that the new act was unconstitutional as applied to the particular district.

The weight of Judge Yankwich's decision is minimized somewhat by the fact that he frankly states that as a private student of the law he would have determined otherwise, except for the Ashton Case.

However that may be, it is evident to my mind that following the same line of reasoning adopted by Judge Yankwich, this particular district, Drainage District No. 7 of Poinsett County, Arkansas, is not a political subdivision, not an arm of the state for any governmental purpose, and that the new composition act can apply to it with perfect consistency and propriety without in any wise disturbing or conflicting with

the decision of the Supreme Court in the Ashton Case.

A large number of cases could be mentioned wherein the Supreme Court of Arkansas has passed upon the status of various improvement districts in Arkansas, but it is not necessary to examine the entire line of authorities, because this individual district has been the subject of a declaration by the Supreme Court of Arkansas which certainly is binding upon this court and which in the most explicit terms states that the drainage district exercises its very limited powers "as the agent of the property owners in the district whose interests are affected by the duties they perform. * * * They are not political or civil divisions of the state like counties and municipal corporations created to aid in the general administration of the government. They are not created for political purposes or for the administration of civil government. Hence no public policy would be violated by applying the same rules for the service of process upon them as are prescribed for private corporations and quasi public corporations, such as railroads, etc." Drainage Dist. No. 7 of Poinsett County v. Hutchins, 184 Ark. 521, 530, 42 S.W.2d 996, 1000.

This case was cited with others in a decision of the Circuit Court of Appeals, Eighth Circuit, wherein that court definitely stated that the drainage district is not a governmental agency under the laws of Arkansas. Drainage Dist. v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 69 F. 2d 138.

In the Hutchins Case this same district was sued in a county other than its domicile. Arguing that the act fixing the domicile of the county must be construed to limit the venue of suits against it to that county, the district sought a writ of prohibition against the judge of another county to prevent the hearing of a damage suit in the other county. The Supreme Court of Arkansas held that if a railroad could be sued and served in different counties, then the drainage district might also be so sued and served without violating public policy to any greater extent than in the case of a railroad.

I take it to be established, therefore, that this drainage district does not partake in any respect of the state's immunity from suit, nor is it a political subdivision such as the Texas Water District was declared to be nor as the California Irrigation District was declared to be.

In view of the fact that I think this drainage district is an agency that comes specifically within the terms of chapter 10 and is not a political subdivision, I do not think there is any conflict with the Ashton Case as a result of my decision in this case.

One reason I am impelled to this conclusion is that in the most explicit way Congress has provided that if the act can be applied to a particular state of facts or a particular district it shall not be invalid because it could not constitutionally be applied to some other district or to some other state of facts.

This saving clause at the close of section 81, 11 U.S.C.A. § 401, is very broad and specific, and in the hearing before the subcommittee of the Judiciary Committee of the House upon the several proposed bills, including H. R. 5969, which hearings resulted in the drafting of the present act, much emphasis is laid upon this saving clause as being intended to avoid the possible effect that a decision in one district might sweep away the act as to all districts. It is true that such a saving clause is not absolutely conclusive, but it is an aid to interpretation which the court will respect, as held in Dorchy v. Kansas, 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686.

I do not think it is necessary for me to determine whether or not this act could be applied to a city or county or other purely governmental agency. If that question should ever arise in any court, I think even that question could be determined under this saving clause of the act without minimizing the power of a drainage district such as the petitioner to avail itself of the act.

This court particularly is aware from its own dockets of the fact that bondholders and creditors in numerous cases have brought suit against drainage districts, road districts, school districts, and improvement districts of every Arkansas type, and such suits have been uniformly sustained and have never been held to be an invasion of State sovereignty nor to impair state control financially or otherwise over any such districts.

A great many receivers were appointed by my predecessors on this bench, pursuant to the law permitting appointment of receiver at the suit of bondholders, and the court knows that these receiverships were

carried on over periods of years and during the receiverships this court has carried on all of the ordinary functions of these debtor districts through the receiver, the powers of the commissioners or directors of such districts being wholly suspended during the receiverships. Many of these cases from the District Courts of Arkansas have gone to the higher federal courts, where such suits and the receivers' powers under the orders of this court have been sustained.

Merely to give a few examples of such litigation which has been held not to constitute any invasion of state sovereignty, I refer to the following: Guardian Sav. & Trust Co. v. Road Imp. Dist., 267 U.S. 1, 45 S.Ct. 201, 69 L.Ed. 487; Mercantile Trust Co. v. Wilmot Road Dist., 275 U.S. 117, 48 S.Ct. 61, 72 L.Ed. 192; Caldwell v. Guardian Trust Co., 8 Cir., 26 F.2d 218. See, also, County of Lincoln v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766.

Even since the repeal of the act permitting the appointment of receivers the federal courts have sustained proceedings wherein the commissioners of a district were themselves declared to be receivers. Drainage District v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 69 F.2d 138.

To show the peculiar situation involved in the determination that the bankruptcy law was unconstitutional because impairing state sovereignty, it appears from the files of this court that immediately after Judge Martineau had sustained the bankruptcy proceedings under the original act, and after the decision of the Ashton Case, and the consequent dismissal of the original proceeding, the majority creditors, represented by the same trustee, appearing in the debt composition proceedings, filed an equity suit in this court asking that the commissioners be declared receivers and that an account be stated as to the debts and assets of the district, and that out of the annual revenues the majority creditors be awarded such proportion as would be proper and that the minority creditors be awarded such proportion of the annual revenues as the court deem proper, and that the court fix a reasonable rate of annual assessment, such as to bring out the greatest possible revenue and not to overburden the lands.

Judge Martineau granted the preliminary order, pursuant to the prayer of the bill and appointed a special master, and this suit is still pending, being held in abeyance on account of the passage of the new composition act now under consideration and the proceedings in this cause. Judge Martineau held in effect that there was ample jurisdiction for such a suit, possibly under the following authorities: Groner v. U. S., 8 Cir., 73 F.2d 126; George v. City of Asheville, 4 Cir., 80 F.2d 50, 103 A.L.R. 568; Jackson v. Ludeling, 21 Wall., 88 U. S., 616, 22 L.Ed. 492; Jewell v. City of Superior, 7 Cir., 135 F. 19; Norris v. Montezuma Valley Irr. Dist., 8 Cir., 248 F. 369; Carteret County v. Sovereign Camp, W. O. W., 4 Cir., 78 F.2d 337; Norfolk & W. R. Co. v. Board of Education, D.C., 14 F.Supp. 475; State ex rel. Buckwalter v. Lakeland, 112 Fla. 200, 150 So. 508, 90 A. L.R. 704 and note.

In determining whether or not chapter 10 is in conflict with the decision in the Ashton Case, I deem it proper that effect be given as far as possible to the manifest intention of Congress in passing the new act, and for this purpose the hearings upon the several bills should be considered, and the report of the committee which was read before Congress as a foundation for the passage of the new act. In considering the hearings and discussion to be of value as a matter of interpretation, I act pursuant to authority of Wright v. Vinton Mountain Trust Bank, 300 U.S. 440, 57 S. Ct. 556, 81 L.Ed. 736, a decision rendered by the Supreme Court on March 29, 1937. That case interpreted and held constitutional the new Frazier-Lemke Act, 11 U. S.C.A. § 203(s), which was expressly intended by Congress to stand as a substitute for the original Frazier-Lemke Act, 48 Stat. 1289, which original act was held unconstitutional in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

In the decision upon the new act the Supreme Court quoted at length from the hearings and discussion by the legislators in charge of the bill and applied a liberal interpretation to its provisions in order to hold that the new act was valid. The court declared that after full discussion Congress had concluded that the new bill re-enacted by it was free from the objectionable features which had been held fatal to the original act.

Searching the hearings and the report of the committee upon the new Debt Composition Act, we find that the intolerable situation of various districts were discussed and that the deliberate attempt of

the committee was to prepare an act which would be free from the objections held fatal to the original act in the Ashton Case. The committee reported to Congress, and its report is quoted in the opinion of Judge Yankwich previously referred to, that it believed the new act was not invalid nor contrary to the majority opinion in the Ashton, Case; that the original act which was declared unconstitutional therein designated the instrumentalities included in its provisions as political subdivisions of the State whereas the new act more specifically avoids any restriction upon the powers of the states or their governmental arms in the exercise of their sovereign rights and duties, and provides that the taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation and that no involuntary proceedings are possible and no control or jurisdiction over that property or those revenues of the petitioning agency necessary for essential governmental purposes is conferred by the bill.

In view of this declaration by the committee of Congress and the passage of the act by Congress itself, it is evident that Congress considered the act not to be in conflict with the Ashton decision.

Judge Yankwich reluctantly held that notwithstanding the congressional intent the new act as applied to a California irrigation district was in direct conflict with the Ashton Case, because such an irrigation district is considered a political subdivision or arm of the government under the laws of California.

■ Such is not the case with an Arkansas drainage district, and hence I see no conflict between the new act and the Ashton Case, but on the contrary a very careful drafting of the new act so as to try to avoid the difficulties set up in the majority decision in the Ashton Case. In my judgment Congress has deferred to that decision and has followed the exact procedure sustained by the court in its interpretation of the new Frazier-Lemke Act. There is nothing inherently wrong and on the contrary it is very proper that Congress, seeking what it considers the public good, should attempt to pass a constitutional act to reach the desired result and thus to avoid conflict with a decision holding an earlier and different act unconstitutional.

■ The question was raised in argument as to whether or not the new act could apply constitutionally to an Arkansas district because it was urged that no legislation of Arkansas permitted a drainage district to avail itself of the act. In the most explicit terms, however, section 12 of Act 212 of 1937, p. 779, creating the State Flood Control Commission, reserves to levee and drainage districts "the right to proceed in pursuance of any insolvency statute or bankruptcy Act now or hereafter adopted by the Congress of the United States, or by the State of Arkansas," and "nothing in this Act shall be construed to require the State Commission hereby created to approve or pass upon any such proceedings nor bankruptcy nor insolvency proceedings nor litigation of any nature affecting such levee or drainage districts and each and every such drainage or levee district may proceed with any and all refinancing and refunding plans, insolvency and bankruptcy proceedings or either, and any and all litigation with like effect as if such State Commission had not been created."

That act was approved March 8, 1937, and it contains numerous other reservations of rights to drainage districts, the general effect of which is to render it wholly unnecessary for any state board to act upon any matters connected with them. In fact, the new law creating the state board so specifically excepts existing levee and drainage districts as to make it conclusive that the Flood Control Commission has jurisdiction only over areas where there are no existing levee or drainage districts. Hence express legislative permission has been granted for this proceeding if any be required; but I do not deem that permission is required in view of the general authority of the districts to control their financial affairs, to refund their bonds and to sue and be sued.

■ It is important that the new act seems to omit any provision requiring any permission from state authority. There is an apparent intention in the new act to accentuate the composition feature and to minimize the debt readjustment feature of the original act. Probably there was not any clear or substantial difference, but at any rate this emphasizes the voluntary nature of the proceedings and further shows the willingness of Congress to avoid impairing any state control of any State governmental agency.

The new act provides that no order or decree in the proceeding or otherwise shall interfere with any political or governmental powers of the petitioner nor with any

of the property or revenues of the petitioner necessary for essential governmental purposes nor with any income producing property unless the plan of composition so provides.

Furthermore, before putting the composition into full effect the court must decide that it is fair, equitable, and for the best interest of creditors and does not discriminate unfairly in favor of any creditor or class and that the offer of the plan and its acceptance are in good faith and, that *the petitioner is authorized by law to take all action necessary to be taken by it to carry out the plan*. This is an additional safeguard to bar from its benefits any agency which cannot lawfully perform its requirements.

The new act enumerates a number of agencies which at least in many states are not considered arms of the government and in the last clause referring to petitioners mentions cities or other municipalities, but immediately following this clause, which is clause 6 of section 81, 11 U.S.C.A. § 401, there follows the very elaborate provision previously referred to; that if it be held invalid as to any particular petitioner or under any particular circumstances, such holding shall not impair its validity as to other agencies or under other circumstances where it can be constitutionally applied. Hence I cannot see that the inclusion in clause 6 of the cities and other municipalities could affect the act in so far as it applies to an Arkansas drainage district such as the present petitioner. Under that clause I can even conceive that the act might be effective as to an Arkansas or possibly a Florida district or one from other states even though it might not apply to a water district in Texas or an irrigation district in California. Certainly full effect should be given to the act of Congress under whatever circumstances it can constitutionally apply, even if that be quite limited in scope. If it applies equally throughout the United States to all districts capable of meeting its requirements that constitutes uniformity within the meaning of this Bankruptcy Act.

To my mind under the conditions prevailing in Arkansas, the provisions of the act seem fair, just, and equitable, and in fact the experience of many districts that have been in this court through receiverships and otherwise show that the act is as much for the benefit of the bondholders and creditors as it is for the taxpayers. The situation in many districts was such that by no possibility could the existing debt structure be paid and in my judgment it is important that the parties be empowered to make a fair composition, considering the assets and the liabilities and, of course, no fairer means of judging what is a fair composition exists than that of letting a majority of the creditors decide the question.

The petition in this instance certainly does not show any bare majority, but petitioner claims that approximately 98 per cent. of the bondholder creditors and 88.5 per cent. of the judgment creditors have accepted the plan. Hence, although the rate of payment seems small, it is apparent from the debt structure and from the acceptance of the composition by such a large majority of the district's creditors that the amount was considered apparently fair.

However, the upholding of the composition is not an issue upon this particular hearing on motion to dismiss, but is only referred to as indicative of the fact that this proceeding has the support of much more than the required percentage of creditors, and that this is some indication of its fairness.

It will be noted that I am not particularly impressed with the objections that the proceeding takes private property without compensation, nor that the due process clause is violated, nor that it permits repudiation of contracts. The reason I do not discuss these points is that they are embraced in the main question of whether or not this is a valid bankruptcy act of Congress. Bankruptcy laws always permit impairment of contracts. The prohibition against laws of that nature does not apply to Congress, nor to a bankruptcy act. Furthermore, I am not impressed with the peculiar argument that the State of Arkansas has passed a law impairing the obligation of a contract simply because it passively permits a drainage district to avail itself of an act of Congress.

Holding these views, I deem it my duty to hold chapter 10 amendatory to the Bankruptcy Act to be valid and constitutional in the present case, and the motions to dismiss upon the ground of unconstitutionality are overruled and exceptions granted to such ruling.