### In re DRAINAGE DIST. NO. 7 (LUEHRMANN et al., Interveners).

District Court, E. D. Arkansas, Jonesboro District.

Aug. 25, 1938.

Chas. D. Frierson, of Jonesboro, Ark., for petitioner.

Archer Wheatley and A. P. Patton, both of Jonesboro, Ark., for W. B. Chapman, trustee.

Chas. D. Long, of St. Louis, Mo., and J. B. Daggett, of Marianna, Ark., for objecting bondholders Luehrmann et al.

C. T. Carpenter, of Marked Tree, Ark., and J. T. Coston, of Osceola, Ark., for two objecting creditors.

TRIMBLE, District Judge.

The substance of this plan of debt composition is set out in my former opinion on the constitutionality of the Bankruptcy Act, Secs. 81–84, 11 U.S.C.A. §§ 401–404, reported D.C., 21 F.Supp. 798.

A group of bondholders and one judgment creditor have objected. Their objections cover the following points: That the district is not insolvent but has been made solvent through transactions of Reconstruction Finance Corporation because the form of those transactions wherein the majority of bonds and judgments were acquired by the trustee with funds from Reconstruction Finance Corporation amounts (1) to payment by the district or (2) is an accord and satisfaction, or (3) is a novation, or (4) at least that securities so acquired must be considered as "Owned or controlled by the petitioner" and therefore cannot be voted under the very terms of the statute. That as a result the present debt structure of the district equals only the aggregate monetary outlay of Reconstruction Finance Corporation plus the total of outstanding nonconsenting bonds (approximately $100,000), plus the Haverstick judgment ($20,000). Interest, of course, is claimed in favor of objecting creditors but it is argued that the transactions have waived all interest as to consenting creditors.

Exhibit "C" to the petition shows outstanding original bonds of $5,659,887.50

and judgments totaling $174,493. A balance of $210,000 advanced as an emergency loan by Reconstruction Finance Corporation for new outlet was due. The district's structures being damaged by floods the same agency advanced $120,000 for rehabilitation beginning about September 4, 1936, this loan being supplemented by an outright gift from the Public Works Administration of $100,000 for the same purpose.

All parties agree that the district was insolvent when the petition was filed if the foregoing amounts constitute its debt structure, regardless of interest. Interest was in arrears for years and would largely increase the total.

The interveners contend that in their effort to readjust the debts of the district the Reconstruction Finance Corporation, the trustee and the district and original bond and judgment holders have so acted as to reduce tremendously the outstanding debts of the district and that the result is that the district is not now insolvent but solvent and that the objecting creditors have been advanced into a preferred position so that the debts to all objecting creditors are now worth 100¢ on the dollar plus all interest, this situation having resulted from the loss of about 74¢ out of every dollar that has been sustained by the majority creditors.

Objectors also contend the plan is not fair but discriminates in favor of the emergency loans of Reconstruction Finance Corporation for new outlet and for rehabilitation for which it provides payment in full.

Certain bondholders holding bonds of the first issue contend that their bonds are entitled to priority in accordance with date and that therefore all bonds of the 1919 issue and interest should be paid in full before paying other bonds and so · on throughout the list, according to date.

Haverstick, the only objecting judgment creditor, claims complete priority over all bonds and debts of whatsoever nature because, he alleges, his judgment was based on a taking of his land contrary to the Constitution of Arkansas and he attempts to distinguish in this regard between his own judgment and that of the twenty-four other majority judgment creditors. He also contends that the provision of the general bankruptcy act providing for upholding liens more than four months old should be applied under the present act and

that his judgment should have priority for this reason.

The three Luehrmanns deposited $15,000 par value of bonds with the Bondholders Protective Committee and that committee sold those bonds to Ritter, Trustee, who received the money from the government agency therefor at 25.879¢ on the dollar of principal and those bonds passed to the trustee. The Luehrmanns claim that this deposit should be disregarded and that they should recover 100¢ on the dollar for these bonds.

Bradsher filed a claim for unliquidated damages resulting from overflow for which he had brought suit in the State Court. If the plan is upheld he asked that his claims be liquidated and judgment rendered by this court for something more than $200,000.

### Was the District Solvent or Insolvent when the Petition was Filed?

As a result of the floods of 1927 the district defaulted on August 1, 1927. A Bondholders Protective Committee was formed which attempted to arrange for a kind of moratorium by providing for the issuance of refunding bonds. However, tax payments decreased, land values became low and the inability to pay debts on maturity continued. A new Bondholders Protective Committee was created September 2, 1930 under which ultimately about 98.2% of the bonds were assembled or cooperated and all bonds controlled by the committee were sold under the readjustment plan to Ritter, Trustee, the first disbursement being made July 3, 1934, all at 25.879¢ on the dollar of principal. This committee, with the consent of the drainage district, and to avoid a receivership, placed its secretary, Gray, in the district's office and from 1931 or earlier until the first disbursement, Mr. Gray sat in all board meetings, held almost a veto power over all transactions, directed litigation and undertook to bring about a composition of the district's debts.

The Steepgut outlet proved unsatisfactory and the Committee, through Mr. Gray, planned the new outlet, which litigation delayed during 1931 but which was begun in 1932 and was completed in 1933, whereby the waters were cut off from the Steepgut Floodway and transferred far to the southwest into St. Francis Bay. The district having no money to pay either for right-of-way or construction, the committee, through Mr. Gray, arranged to acquire

right-of-way within the district by the issuance of tax anticipation vouchers payable over a period of years and for construction consented to the diversion of tax money over a period of five years which was pledged to payment of bonds and coupons. This method of financing proving too slow because large amounts of taxes were delinquent, the Bondholders Committee and the district joined in applying for an emergency loan from Reconstruction Finance Corporation and procured authority to borrow $250,000 but only borrowed $235,000, of which $210,000 balance still is outstanding. The litigation which delayed completion of the new outlet is evidenced by the opinion in Drainage Dist. No. 7 v. Hutchins, 184 Ark. 521, 42 S.W.2d 996. After that opinion Mr. Gray and the district settled with all the Cross County landowners then objecting, but later, as hereafter set out, the district was sued by twenty-four other landowners of Cross County. The Reconstruction Finance Corporation would not authorize the outlet loan until the Bondholders Committee canceled $250,000 of interest coupons in order that the aggregate of the district's debts would not be increased by the loan.

When the Reconstruction Finance Corporation was given authority to grant loans to such district to readjust their finances, the Bondholders Committee through Mr. Gray and the secretary of the district immediately on approval of that act applied for such a loan. The matter dragged for months but on January 4, 1934 the Reconstruction Finance Corporation offered a loan to the district of 25.879¢ on the dollar of principal not including interest. The Bondholders Committee and Gray, as representing certain other bondholders, accepted but their bonds amounted then to only about 95% of the total issue and furthermore two judgment creditors objected, including Haverstick.

The original bankruptcy act of May 24, 1934 had not then been passed but was discussed. No disbursement was made to the consenting majority of creditors until after the bankruptcy act was passed.

Gray, Brigance, Dewey and all others who were familiar with the transaction who testify declare that it was the intention of all parties to the transaction to keep alive, outstanding and uncancelled all original securities for the very purpose of preventing objecting creditors from obtaining a preference. It had become evident that a minority were hanging back and seeking to obtain 100¢ on their minority debts as a result of the sacrifice of the majority, hoping that the district would become solvent as a result of the monies paid out by Reconstruction Finance Corporation to consenting creditors.

To prevent this kind of situation was the very purpose of the debt readjustment act and is the purpose of the 1937 debt composition act.

The clearest evidence of the intention is contained in the following letter from Mr. Emil Schram, Chief of the Drainage Division of the Reconstruction Finance Corporation to the district:

"Reconstruction Finance Corporation Washington

"June 6, 1934

"Mr. T. C. Brigance, Secretary
"Drainage District No 7, Poinsett County
"Marked Tree, Arkansas

"Re: Docket No. Ref. 4

"Dear Sir:

"In view of existing conditions and the present status of the program for effecting the loan authorized to the above named district by a resolution of the Reconstruction Finance Corporation dated January 4, 1934, I find it necessary to and do hereby require that all the outstanding Old Securities of the District be deposited or otherwise made available for refinancing as required by the resolution before disbursement of such loan will be authorized.

"However, in view of the fact that more than 90% of the Old Securities have been deposited or are otherwise now available for refinancing and in order to avert the possible withdrawal of any part thereof prior to the time when the remaining Old Securities are so available, as herein required, the Corporation will, as a step toward the final consummation of the loan and to maintain unimpaired the present possibility thereof, take up the Old Securities now available for refinancing through an advance or advances made to an Owners' Agent upon the following terms and conditions, to-wit:

"(1) Such advances to be made in a like manner as is provided in the resolution for making temporary loan or advances to Owners' Agents.

"(2) The Old Securities taken up through such advances to be paid for at the rate and subject to the conditions set forth in Paragraph 3 of the resolution.

"(3) Pending final disbursement of the loan or upon the expiration of the time within which the loan must be disbursed, the Old Securities so taken up shall at all times be and remain obligations of the District at their full face value plus accrued interest and the corporation and its assigns, acting in their own behalf as the owners of such Old Securities or in the name of the Trustee or Owners' Agent for the use and benefit of the Corporation and its assigns, shall have the unqualified right to enforce full payment of the Old Securities and the accrued interest thereon to the same extent and with like effect as if the same had been purchased on the open market and in due course.

"(4) That the District by Resolution, a form for which is enclosed herewith, shall agree and assent to the action of the Corporation in taking up the Old Securities upon the terms and conditions herein set forth.

"Very truly yours,
 "Emil Schram, Chief
 "Drainage, Levee and Irrigation Division."

The dates are significant as corroborating this intention. The loan was offered January 4, 1934 but nothing was paid out until July 3, 1934. Meantime Congress passed the first bankruptcy act May 24, 1934 and the Schram letter was dated June 6, 1934. Immediately upon the disbursement, or on July 12, 1934, petitioner filed its first debt readjustment proceeding under the original act. It is impossible not to regard these dates as evidencing a sustained plan. The objectors, of course, are not able to contradict the evidence as to intention because the objectors were not a party to the deal. They argue, however, that regardless of intention the form of the transaction constituted a reduction of the total debt. They argue with great ingenuity that the result could not be avoided because the purpose of Congress in authorizing the loan was to reduce the debts of the district, and hence it would not be legal nor fair for the Reconstruction Finance Corporation to acquire the majority securities and then hold them at a profit above its purchase price. These objectors seek to tie the Reconstruction Finance Corporation to a program of generosity, to claim that the Corporation has no right to be other than generous; while at the same time objectors seek to obtain not equality with other creditors but a great preference as a result of such governmental altruism. They say that regardless of what the Reconstruction Finance Corporation declares, Congress does not permit it ever to collect more than its outlay plus interest.

If this argument be correct then any attempt at a composition of debts through a government loan must always result in the enrichment of the wise and thrifty few who stand out for the full face of their debt and will not take any loss. Substantially, it would be to amend the act so as to provide that two-thirds of the creditors could put through a composition affecting consenting creditors alone if financed by a loan from Reconstruction Finance Corporation; provided that all objecting creditors should be paid in full at par plus interest. Needless to say there would always be objecting creditors if such were the construction of the law because they would inevitably reap full payment as a result of the sacrifice of their associate creditors.

Congress certainly would not pass a law so foolish and certainly such a law would not be necessary because it would add nothing to the rights of the district to enter into an accord and satisfaction with any individual creditor. I must suppose that the act of Congress was intended to perform some sensible function and on its face it purports to declare that two-thirds of the creditors may enforce a composition on a recalcitrant minority. The contrary interpretation would not be fair to consenting creditors, nor to the debtor.

To show conclusively that my interpretation is correct it is only necessary to refer to the section of the new act which provides that all securities held by an agency of the government shall be counted at their full face value, in determining whether the composition shall be established. This evinces an intention that Reconstruction Finance Corporation may acquire securities from holders willing to accept the composition rate and then vote them at full value to sustain the plan, although purchased at less than full value.

As to the contention that the transaction constituted an accord and satisfaction as to the majority bonds and judgments, the answer is that the district did not pay anything but the money was advanced by a governmental agency acting as banker. Hence it was not payment but a change of ownership.

As to the contention that a novation was created the answer to that is that the

refunding bonds were never delivered but are deposited in escrow with Union & Planters National Bank & Trust Company in Memphis awaiting the consummation of the plan. Furthermore, the original bonds were never canceled but are held as collateral to the Ritter, Trustee, note, in Federal Reserve Bank at Cleveland, Ohio. Thus the old securities were not canceled and the new securities were not delivered and I am at a loss to see how there could be a novation. The reasonable interpretation is that every step was part of a consistent plan to readjust the debts of the district and that nothing was canceled and no new securities issued because during the entire period every act was contingent upon establishment of the plan.

As to the argument that the petitioner "owns or controls" the majority of debts and therefore that they cannot be voted in the composition, this is not at all convincing to one familiar with governmental agencies. These securities were paid for by Reconstruction Finance Corporation and were not canceled nor were the judgments satisfied. It is clear to me that those securities are "controlled" by the governmental agency, although the legal title is in Chapman, Trustee.

The objecting creditor Haverstick argues that Chapman, Trustee (successor to Ritter), cannot legally vote the securities because he was appointed trustee only as a part of the transaction between the Bondholders Protective Committee, the Governmental agency and the district and for the sole purpose of acting as a conduit for the money and to take over the securities. That immediately thereafter his functions ceased. This would be to treat the trustee as functus officio at the very moment that he acquired several million dollars worth of bonds. Surely the court would construe him to be a trustee for somebody in regard to those securities for which he had not expended a penny of his own money. Furthermore at a later date he was made trustee in specific language to acquire and hold the majority of judgment debts represented by the Cross County judgments which he held just as he held the bonds. I think that he clearly has the right to vote securities held by him in this proceeding.

Summing up the facts I am convinced that the majority securities purchased with money advanced by governmental agency were not canceled nor paid nor satisfied and that there was no novation but that all proceedings were tentative and anticipated the consummation of a debt composition and that all the outstanding original bonds and the majority judgments should be considered and voted at their full face value.

As a result of these conclusions the debt structure of the district is that set out in the petition and exhibit and 98.2% of bondholders and 88.5% of the judgment creditors favor the composition and it is the duty of this court to put it into effect. Hence, of course the district was clearly insolvent when the petition was filed.

As to the authorities, such matters are determined by the intention of the agency advancing the money and of the person who transfers the security and of the debtor. The evidence here clearly shows the old securities and judgments purchased were to remain alive unless and until the debt composition plan should be established. Ketchum v. Duncan, 96 U.S. 659, 24 L.Ed. 868. Slupsky v. Westinghouse Electric & Mfg. Co., 8 Cir., 78 F.2d 13, and numerous cases cited. The language of the 7th Circuit in Mowry v. Farmers' Loan & Trust Co., 76 F. 38 is strangely applicable [page 43]:

"It was clearly expected that all the bondholders under prior mortgages and the stockholders would unite in this plan of reorganization; and yet, recognizing what oftentimes, and perhaps generally, occurs in the reorganization of railway, that some of the bonds might not be found, or that some holders would not assent to the scheme of reorganization, provision would seem to have been made to guard against just such a contingency, and to prevent the inequitable result which will follow if nonassenting bondholders should, by means of and through the reorganization to which they would not agree, obtain, with respect to the nonassenting bonds, a decided and inequitable advantage over assenting bondholders, who theretofore stood with them upon an equal plane. * * * These provisions clearly indicate that the discretion was lodged with the committee of the assenting bondholders to protect their rights in the consummation of the plan, and to insist upon such provisions as might be necessary to safeguard their interest. * * * The appellant comes demanding of a court of equity that it shall exercise its equitable powers to compass an inequitable result. Holding a minority of the bonds, he declined to enter into this plan of reorganiza-

tion. That he had a right to do; but he has no right, either moral, equitable, or legal, to say that through his nonassent he shall obtain so inequitable an advantage over the assenting bondholders. A court of equity would be slow to so construe any agreement of reorganization that it would work such unjust result. We find nothing in this agreement or in the act of the parties thereunder which even tends to that conclusion. The understanding seems to us to be express that the first mortgage, and the bonds issued thereunder, should be kept alive until all interests prior to the consolidated mortgage should be finally merged in the latter security, and all interests stand upon an equality of security under the plan of reorganization. We cannot entertain a construction of this agreement which would enlarge the rights of the appellant. There was no contract or agreement with him, and the contract between the assenting bondholders and the railroad company clearly contemplated the continued existence of prior securities." 1 Quindry on Bonds, § 348; 2 Jones on Bonds, 4th Ed., § 729; John Wanamaker v. Comfort, 5 Cir., 53 F.2d 751, 81 A.L.R. 133, and note.

An interesting case to consider in regard to the position of Reconstruction Finance Corporation and its trustee is Security First Nat. Bank v. Rindge Land & Nav. Co., 9 Cir., 85 F.2d 557, 107 A.L.R. 1240. In that case one group of creditors had bought up 98% of the bonds. The stockholders and minority bondholders undertook to reorganize under the corporate reorganization act, section 77B of Bankruptcy Act. The 98% of bondholders would not consent and therefore the plan merely proposed that the bonds be paid at 40% in cash, that being the price the group paid for the bonds. The court held that since the 98% objected, their bonds must be considered at par value and not at the 40% purchase price. That act is entirely different from the present act, but by analogy in the present proceedings the trustee for Reconstruction Finance Corporation should be able to vote the securities acquired, not at 25.879¢ of the value which was the purchase price, but at par.

The authorities cited by objecting creditors are unnecessary to discuss because in the particular case the courts found either that there was accord and satisfaction or a novation or it was found that the securities purchased were intended to be canceled; but the facts of the present case are quite different from those cited by objectors.

## Was the Plan Fair, Equitable and Not Discriminatory?

■ Some indication of the plan's fairness should arise from the fact that the Bondholders Committee and its secretary, Mr. Gray, actually worked out the plan in cooperation with the district and with the Reconstruction Finance Corporation. A majority of the bondholders agreed with the committee as also did a large majority of the judgment creditors. The Reconstruction Finance Corporation after careful appraisement decided that the rate offered, plus the $335,000 emergency loan for necessary repairs and new outlet, constituted the limit of the district's ability.

But objecting creditors urge that the plan is unfair because the governmental agency was to be repaid 100% of its emergency loans with interest and they contend that this constituted an unfair preference. I find these loans, however, were necessary to preserve the physical structures of the insolvent district and the new work resulted to the benefit of the creditors of the district as well as to its taxpayers.

The evidence shows that the bonds of this district sold on the market for as low as 5¢ on the dollar prior to the construction of the new outlet. If the Reconstruction Finance Corporation had lent this insolvent district $335,000 for necessary work and at the same time or immediately thereafter had agreed to accept repayment at 25.879¢ on the dollar of principal, it would have been a very peculiar banking transaction. It is true that the Public Works Administration did grant the district $100,000 constituting 45% of the rehabilitation money. But the 55% or $120,000 under the law creating Reconstruction Finance Corporation must be considered a loan and it would be very strange for any court to hold that the plan of debt composition is unfair because of the provision for a repayment of this fresh money that constituted the salvation of the physical structures of the district. Anyhow the plan itself provides for the repayment at 100% of those two loans and the debt composition act permits modifications of priority if supported by vote of the required amount of creditors. If the act is valid, then the favorable vote embracing repayment in full of these two loans, is sufficient to overrule the contention of unfairness.

I therefore uphold the plan as against the contention of unfairness because of full payment to the governmental agency and on the contrary believe in that respect it was not only fair but it is also quite evident that the success of the plan was dependent upon those two loans and the Government would not and could not have advanced the money without provisions for its full repayment.

Haverstick, the only objecting judgment creditor, makes an individual claim of unfairness which I will discuss later.

### Is There Any Priority According to Date of Bonds?

 The authorities determine this matter against the claim of priority by date. All the bonds of the district are equal so far as dates are concerned. Hoehler v. W. B. Worthen Co., 154 Ark. 444, 243 S.W. 822; Howe v. Long Prairie Levee Dist., 187 Ark. 725, 62 S.W.2d 10; Rowekamp v. Mercantile-Commerce Bank & Trust Co., 8 Cir., 72 F.2d 852. In the latter case the case of St. Louis Union Trust Co. v. Franklin-American Trust Co., 8 Cir., 52 F.2d 431, 87 A.L.R. 386, is distinguished and the Supreme Court of Arkansas is followed.

But the bondholders ought to be estopped by laches and acquiescence from contending for priority according to dates. The evidence shows that no bondholder made such contention either to the committee or to the district until the first bankruptcy petition was filed. The Bondholders Committee of 1930 acted uniformly on the theory of equality and when coupons were canceled to match the $250,000 loan authorized for outlet by Reconstruction Finance Corporation, coupons from bonds of all dates without regard to priority were canceled in accordance with the demand of the governmental agency. A portion of the bonds were refunded in 1927 through a former committee without any distinction as to dates. When the Bondholders Committee sold to the trustee 95% of the bonds they made no distinction as to dates. When other bonds were presented and accepted the composition rate from the trustee, they also did not claim priority. The result is therefore that 98.2% of all bondholders, regardless of date, acquiesced in the theory of parity among all bonds. A large majority of bondholders holding all issues turned in their bonds to the trustee and they are voted in favor of the plan without regard to date.

Furthermore, the very first bond contract provided that other bonds might later be issued and gave the dealer an option to take them when issued. The claim of priority is very much belated and should have been raised earlier, and it is not equitable to permit a bondholder to claim priority at this late date when a governmental agency has offered to purchase securities at a limited amount or to make a loan and when the establishment of priority by dates might consume a great deal of the money furnished by the government in paying prior dated bonds, leaving unpaid a large percent of later dated debts.

The establishment of the plan by the necessary vote in itself ought to dispose adversely of this argument of priority by date.

### As to the Bonds Deposited by the Three Luehrmanns with the Bondholders Committee.

 Each of the three Luehrmanns deposited $5,000 of bonds, aggregating $15,000, with the Bondholders Protective Committee, under the September, 1930 agreement. That deposit agreement gives the committee legal title to deposited bonds with the absolute right to dispose of them as it deemed best and to act entirely within its discretion in that regard. The committee sold those bonds to Ritter, Trustee, at the debt composition rate as a part of the disbursement on July 3, 1934. It is certainly clear that these bonds passed to the committee from the Luehrmanns and by the committee were legally transferred to the trustee and that if the Luehrmanns have any claim in regard to such bonds it is against the Bondholders Committee and not against either the Reconstruction Finance Corporation or the petitioner. Having voluntarily transferred legal title to their bonds to their committeee, they cannot repudiate the act of their own agency in disposing of those bonds under the plan.

### The Claim of Bradsher.

 J. A. Bradsher owned lands when the reassessment of benefits and damages was fixed by the County Court of Poinsett County on May 31st and June 1, 1922 and upon those plans for the first time the Steepgut Floodway was established and it was planned to run through a quarter section belonging to Bradsher. When the reassessment was established Bradsher owned only about half the lands embraced within his present claim. Alcorn owned

about half and Bradsher did not buy from Alcorn until 1923 and after the reassessment was established, and in fact not until the Steepgut Floodway entered the river. Alcorn accepted the reassessment and did not appeal and evidently Bradsher could have no claim on the Alcorn lands.

In September, 1922 Bradsher voluntarily abandoned his written objection and appeal from the reassessment as to all lands therein described, except the quarter section split by the floodway. Bradsher asked $30,000 damages, a demand which he later reduced, and the district sued to condemn the right-of-way through that quarter section. In December, 1922 the district agreed to pay Bradsher $20,000 provided he would give them a deed to the entire quarter section and the agreement was evidenced by consent judgment. Bradsher testified that he gave a deed but it seems to have been lost. Nevertheless the district went into possession of the quarter section and in 1923 paid Bradsher the $20,000 plus interest.

Bradsher became a member of the board under special act of 1923 and stayed on the board until 1925 without making any additional claim. During that time he persuaded many persons to dismiss their own appeals and claims of damages. Immediately after Bradsher's appointment to the board the Legislature passed a curative act confirming the reassessment of 1922. The works of the district were completed in January, 1925, as announced in a decision of the Supreme Court of Arkansas in Drainage District No. 7 v. Haverstick, 186 Ark. 374, 53 S.W.2d 589, and the statute of limitations is one year from the completion of the work. Bradsher did not bring suit until May 25, 1929.

In his own evidence Bradsher admitted that he raised good crops and was not damaged during several years, but suffered damage during wet years, particularly in the flood of 1927. Bradsher's excuse for not suing within the one year period of limitations was that Harman, a consulting engineer of the district, told him prior to January, 1923 that when the Steepgut Floodway was connected with the river it would relieve his lands of excessive water. Bradsher admitted that the new (1933) floodway gave him complete relief. Harman left the employ of the board in 1925 and, as above stated, Bradsher was a member of the board from early in 1923 to 1925 and made no claim during the period and

hence evidently that promise was not sufficient to justify him in waiting from January, 1925 to May 25, 1929 before bringing suit. Long before he sued he should have discovered that Harman was mistaken, if his evidence of damage is accepted.

He testifies vaguely that Dewey, President of the Board, and another engineer discussed installing a floodgate but he did not fix the date of the discussion and other witnesses say that the floodgate was not mentioned until 1928, not long before he brought his suit. Evidently the statute of limitations had already run before this discussion occurred and Dewey denies making any promise about a floodgate or otherwise.

A great deal of evidence was taken in the first bankruptcy hearing before the special master. The special master decided against Bradsher on all points. Bradsher died and the claim was revived in the name of his son, as administrator. Judge Martineau sustained the special master and held Bradsher barred and found the facts against him.

The Bradsher claim is barred for so many reasons that the only purpose of this full discussion is in order that it will be a termination of this litigation, which is apparently so baseless, but has dragged on almost ten years.

1. He is barred by the one year statute of limitations under 1 Pope's Dig. § 4943; Hogge v. Drainage Dist. 7, 181 Ark. 564, 26 S.W.2d 887; Drainage Dist. No. 7 v. Haverstick, 186 Ark. 374, 53 S.W.2d 589.

2. He is barred by failing to appeal within thirty days from the reassessment of 1922 under the following and other authorities. Road Imp. Dists. v. Crary, 151 Ark. 484, 237 S.W. 444; Pierce v. Drainage Dist., 155 Ark. 89, 244 S.W. 342.

3. A taking for public purposes does not require a jury trial in condemnation proceedings and the assessment of benefits and damages amounts to a negative finding as to damages and if no damages be found the property owner within the district loses his right by not appealing within thirty days allowed by law. This principle is very closely akin to the last above discussed. Young v. Red Fork Levee Dist., 124 Ark. 61, 186 S.W. 604; Dickerson v. Tri-County Drainage Dist., 138 Ark. 471, 212 S.W. 334; Schmidt v. Drainage Dist. No. 17, 140 Ark. 541, 215 S.W. 614; Sain v. Cypress Creek Drainage Dist., 161 Ark. 529, 257 S.W. 49, 258 S.W. 637, certiorari denied 265 U.S. 589, 44 S.Ct. 634, 68 L.Ed. 1194, writ of

error dismissed, 268 U.S. 675, 45 S.Ct. 508, 69 L.Ed. 1151.

4. He is barred by the curative act. Caldwell v. Guardian Trust Co., 8 Cir., 26 F.2d 218; Utter v. Franklin, 172 U.S. 416, 19 S.Ct. 183, 43 L.Ed. 498; Road Imp. Dist. v. St. Louis-S. F. R. Co., 164 Ark. 442, 262 S.W. 26.

5. The suit brought by Bradsher in the County Court in 1922 and later expressly abandoned by agreement, and also the $20,-000 condemnation suit settled in December, 1922, constitute res judicata because Bradsher had the right to bring up in those suits any claim of damages that he presented in his 1929 suit and he failed to do so in regard to any of the lands in controversy at present. Howard-Sevier Road Imp. Dist. v. Hunt, 166 Ark. 62, 265 S.W. 517, and cases cited therein.

6. Bradsher's damage consisted merely of occasional damage to crops of a consequential nature; none of his land in this litigation was taken within the rights-of-way of the district. A Drainage district is a lawful structure and is not a "continuing nuisance," and because they are constructed for the greatest good to the greatest number landowners accidentally and occasionally injured are not entitled to damages. Board of Imp. of Sewer Dist. v. Moreland, 94 Ark. 380, 127 S.W. 469, 21 Ann.Cas. 957; Wood v. Drainage Dist., 110 Ark. 416, 161 S.W. 1057; Timothy F. Foohey Dredging Co. v. Lovewell, 115 Ark. 606, 170 S.W. 1012; Nugent v. Board of Mississippi Levee Com'rs, 58 Miss. 197; McCoy v. Board of Directors of Plum Bayou Dist., 95 Ark. 345, 129 S.W. 1097, 29 L.R.A.,N.S., 396; City Oil Works v. Helena Imp. Dist., 149 Ark. 285, 232 S.W. 28, 20 A.L.R. 296.

7. There is no evidence of fraud or promise. A much stronger case than the present resulting adversely to Bradsher's son-in-law, Burton, is Burton v. Drainage Dist. No. 7, 187 Ark. 193, 58 S.W.2d 935.

### J. G. Haverstick Judgment.

 No plan affected Haverstick's lands, which are situated in Crittenden County, until 1922, and the Steepgut Floodway, which caused his damage, was completed in January, 1923. $3,600,000 of bonds were issued on plans that did not indicate any injury would occur to Haverstick. His lands were not embraced within the district and are not touched by any structure of the district, but were simply subjected for a time to an increased flow of floodwater. Although Haverstick had lost his land through foreclosure and his injuries were caused by the concurring acts of all the districts above him on the St. Francis River and not solely by petitioner, yet he recovered a verdict for $20,000 on the theory of total and permanent destruction of his land for agricultural purposes. Petitioner claimed the verdict was excessive, but the Supreme Court of Arkansas overruled this contention on the ground that the land was "totally and permanently destroyed for agricultural purposes." Drainage Dist. No. 7 v. Haverstick, 186 Ark. 374, 53 S.W.2d 589. That decision was rendered October 24, 1932. At that time the new outlet was being planned but its completion was delayed by litigation in the Chancery Court of Cross County culminating in Drainage Dist. No. 7 v. Hutchins, 184 Ark. 521, 42 S.W.2d 996, rendered November 2, 1931.

During 1933, and less than a year after the pronouncement by the Supreme Court, the Haverstick land was completely reclaimed, the Steepgut Floodway was abandoned and all water was diverted far to the southwest and as a result thereof twenty-four Cross County claimants, who had not participated in the Hutchins litigation, obtained judgments in the Federal Court in the original bankruptcy proceedings for a total of $154,493, their suits having demanded $529,595. These judgment creditors, doubtless realizing the impossibility of collecting, accepted the debt composition rate of 25.879¢ on the dollar of principal, the same as bondholders, voted for the plan and for that consideration assigned their judgments to Ritter, Trustee, receiving payment from funds of Reconstruction Finance Corporation.

Under the present act, debts are not classified and the aggregate of all creditors establish the composition. Bondholders consenting hold 98.2% of the bonds and the twenty-four judgment creditors hold 88.5% of all judgments. Thus Haverstick is outvoted even if we should classify, and is still more heavily outvoted if the aggregate of all debts is considered.

Haverstick claims priority under the authority of the decision in Keith v. Drainage Dist. No. 7, 185 Ark. 553, 48 S.W.2d 236. However, neither Haverstick's lands nor the Cross County lands were taken within the reservoir as was the Keith land, nor were they embraced within the

district nor touched by its structures. The Keith decision followed a line of railroad cases holding that where a railroad right-of-way took land without payment the owner was entitled to payment prior to mortgages and bonds, because it was impossible to establish a vendor's lien or other lien against the particular tract taken and the only way to work out the right of payment for the land taken was to give a judgment against the whole railroad. But no such theory could apply to the Haverstick lands because they were not taken and were not embraced within the district. Numerous decisions which are collected in regard to the Bradsher claim supra hold that a drainage district is not liable for merely consequential damages resulting from occasional floods because drainage districts do not constitute continuing nuisances but are lawful structures.

At any rate if Haverstick's judgment is entitled to priority under the Constitution then there is absolutely no distinction between his judgment and the twenty-four Cross County judgments in type. The same water that injured Haverstick for a time was diverted and subsequently injured in the same manner the Cross County claimants. It is not reasonable to give Haverstick any priority over the Cross County claimants. If his judgment was based on the constitution, then so were their judgments.

Haverstick claims, however, that his judgment is sacred and different because the Supreme Court of Arkansas announced that his lands were totally and permanently destroyed. That announcement could not be correct because within a year those lands were completely reclaimed. Thus as a result of the sacrifice of others the cause of Haverstick's injury was completely removed during 1933. It was impossible to present that matter to the Supreme Court because of the delay resulting from the litigation in Cross County to block the new outlet. The decision in the Cross County case is evidenced by the opinion rendered November 2, 1931: Drainage Dist. No. 7 v. Hutchins, 184 Ark. 521, 42 S.W.2d 996. Since this litigation was settled the new outlet was begun and its completion was hastened as a result of a loan from Reconstruction Finance Corporation as above recited.

Throughout our jurisprudence there has always been some method of correcting a judgment which becomes unjust by subsequent developments. The original common law method was by a writ of audita querela but the modern remedy is by proceeding in equity. The matter is not essential and I mention only a few authorities for that reason. 6 C.J. pp. 850, 851; 34 C.J. p. 442, 444, 450; 15 R.C.L., Judgments, pp. 724, 752, 758; Humphreys v. Leggett, 9 How. 297 13 L.Ed. 145; Laun v. Kipp, 155 Wis. 347, 145 N.W. 183, 5 A.L.R. 655 (quoting from Marine Ins. Co. v. Hodgson, 7 Cranch 332, 3 L.Ed. 362 by Chief Justice Marshall); 1 Freeman Judgments, 5th Ed., Sec. 308; 2 Freeman Judgments, 5th Ed., Sec. 1100; 3 Freeman Judgments, 5th Ed., Sec. 1178; Jacks v. Adair, 33 Ark. 161.

It would not be just to give Haverstick a preference based on an announcement of the Supreme Court which is rendered baseless by subsequent facts.

Haverstick also claims priority because his judgment was more than four months old when the petition was filed and he claims that by analogy the court should adopt from the general bankruptcy act the provision protecting liens four months old. I am not justified in adopting by analogy any provisions of the general bankruptcy act because the present act does not provide therefor. On the other hand this act is a very special kind of legislation, applicable to taxing agencies and permitting them to refund and to make a composition of their debts. It provides that the plan may change priorities and also that debts payable from taxes and from the same source are to be considered as one class. It is very clear that all the debts of a drainage district are payable out of taxes levied against the assessment of benefits. Hopson v. Oliver, 174 Ark. 659, 298 S.W. 489; First National Bank v. Wells River Sav. Bank, 179 Ark. 834, 18 S.W.2d 370; Faulkner Lake Drainage Dist. v. Williams, 169 Ark. 592, 276 S.W. 604; Kochtitzky v. Mercantile Trust Co., 8 Cir., 16 F.2d 227; Canal Const. Co. v. Federal Life Ins. Co., 8 Cir., 21 F.2d 928; Miller v. Hamilton, 8 Cir., 233 F. 402; Arkansas-Louisiana Highway Imp. Dist. v. Pickens, 169 Ark. 603, 276 S.W. 355.

But an even simpler answer to the argument is that all the Cross County judgments and all the pledges to bondholders are more than four months old. Hence even if we lift that provision from the general bankruptcy act it would give Haverstick no preference. Haverstick is outvoted by much more than the required percentage

and is not entitled to any preference or priority.

Summing up I think the plan is fair, equitable and the amount thereof is all that the petitioner is able to pay.

It is true that the assessment of benefits runs to large figures but, after all, the assessment was a matter of estimate when the work was originally planned and the history of this district proves that not all of it is collectible. The tax does not constitute a personal debt but merely results in a sale of the land to the district because no outsider has bought at such delinquent sales for years. The district obtains a title but at the same time the same land has sold for State and County taxes to the State, and for Levee taxes to the St. Francis Levee District which overlaps the area. Hence the district has no title that is readily marketable. Considerable areas bearing a very high assessment on paper are still too wet for successful cultivation and the timber has been removed and those areas contribute nothing.

The real ability of a drainage district to pay debts is dependent upon the ability and willingness of the taxpayers to produce funds with which to pay and the evidence shows that when the rate in the present district goes too high, tax payments decrease, so that a reasonably low rate produces more money than an excessive rate.

I am convinced from the evidence that the appraisement by the Reconstruction Finance Corporation and the Bondholders Protective Committee has justly gauged the ability of this district to pay.

I find all issues in favor of the district and against the objectors and a decree and findings of fact will be prepared in accordance herewith and the exceptions of all objectors and right to appeal will be preserved.